No. 01-380

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 178

STOCKMAN BANK OF MONTANA,
a Montana Banking Corporation,

Plaintiff/Respondent,

v.

RICK POTTS,

Defendant/Appellant.

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Gregory R. Todd, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

W. Scott Green, West, Patten, Bekkedahl & Green, P.L.L.C., Billings,
Montana

For Respondent:

Gerald B. Murphy, Doug James, Moulton, Bellingham, Longo & Mather,
P.C., Billings, Montana

Submitted on Briefs: November 29, 2001

Decided: August 9, 2002

Filed:

_____
Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

¶1   The Plaintiff, Stockman Bank, filed a complaint in the District Court for the Thirteenth Judicial District in Yellowstone County on February 2, 1999.  In the complaint, the Bank alleged that the Defendant, Rick Potts, was in default on a loan made by the Bank and sought to foreclose on its security interest.  Potts filed an answer and counterclaim in which he alleged breach of contract and breach of the covenant of good faith and fair dealing.  Potts eventually paid the amount owed to the Bank and the Bank released its liens, however, Potts did not release his counterclaim.  The Bank then moved for summary judgment and enforcement of what it contended was the parties' settlement agreement.  The District Court granted the Bank's motion for summary judgment.  Potts now appeals from the District Court's order.  We reverse the judgment of the District Court and remand for further proceedings consistent with this opinion.

¶2   The sole issue presented on appeal is whether the District Court erred when it granted the Bank's motion for summary judgment.

STANDARD OF REVIEW

¶3   Our standard of review of appeals from summary judgment is de novo.  *Motarie v. Northern Montana Joint Refuse Disposal Dist.* (1995), 274 Mont. 239, 242, 907 P.2d 154, 156.  We apply the same criteria which is applied by the district court pursuant to Rule 56(c), M.R.Civ.P.  *Spinler v. Allen*, 1999 MT 1960, ¶ 14, 295 Mont. 139, ¶ 14, 983 P.2d 348, ¶ 14.  The moving party must establish both the absence of genuine issues of material fact and entitlement

to judgment as a matter of law. *Hadford v. Credit Bureau of Havre, Inc.*, 1998 MT 179, ¶ 14, 289 Mont. 529, ¶ 14, 962 P.2d 1198, ¶ 14. Once the moving party has met its burden, the opposing party must present material and substantial evidence, rather than mere conclusory or speculative statements, to raise a genuine issue of material fact. *Hadford,* ¶ 14.

FACTUAL BACKGROUND

¶4    On February 1, 1999, Stockman Bank brought an action in the District Court for the Thirteenth Judicial District in Yellowstone County to foreclose its security interest in certain livestock, machinery, and equipment owned by Rick Potts. The Bank did not allege that Potts had failed to make the payments owed pursuant to his promissory note. Rather, the Bank alleged that Potts' liabilities exceeded the value of the collateral, which resulted in default pursuant to the terms of the note.

¶5    On April 20, 1999, Potts filed an answer and counterclaim. Potts contended that the Bank's failure to release funds to him was commercially unreasonable, breached his contract with the Bank, and breached the covenant of good faith and fair dealing.

¶6    The parties began settlement negotiations in October of 1999 and continued to negotiate through the end of January, 2000. The question decided by the District Court was precisely what the parties agreed to during these negotiations.

¶7    The first attempt at reaching a settlement was an October 5, 1999, letter from Potts' attorney, James Patten, which proposed full settlement if Potts paid $260,000 of the $320,000 amount owed.

3

The offer was contingent on the immediate release of $30,000 to Potts for payment of a feed bill. The Bank did not accept the initial settlement offer and informed Potts that the Bank would not agree to settlement until the Farm Service Administration agreed to cover 90% of any loss the Bank suffered from Potts' loan.

¶8　On January 7, 2000, Patten indicated that Potts was willing to negotiate and that it appeared that Potts would be able to obtain the necessary FSA guaranteed loan from the Washington County Bank in Dickinson, North Dakota. The Bank, which was entitled to attorney fees pursuant to the terms of the loan agreement, offered to waive all attorney fees which it incurred before January 3, 2000, so long as Potts paid all principal, interest, and attorney fees incurred after January 3, 2000.

¶9　In a letter dated January 24, 2000, Potts offered to pay the Bank $310,000 on or before February 15, 2000, if the Bank agreed to immediately release $90,000 for a feed bill and lease payment.

¶10　On January 26, 2000, the Bank's attorney, Pat Kelly, faxed a new counteroffer to Patten. The counteroffer proposed full payment of principal and interest in addition to attorney fees incurred after January 3, 2000. The counteroffer stated that the Bank was willing to forego previously incurred attorney fees in order to settle the case. The proposal included an agreement that the parties release all claims against each other and stipulate to dismiss the matter with prejudice following which the Bank would release the operating funds requested by Potts.

¶11 The Bank's proposal was apparently accepted by Potts on January 28, 2000. The question is whether the acceptance was conditioned on Potts' ability to obtain other financing. Kelly drafted a letter on that day to memorialize the agreement. The District Court looked to the letter to establish the terms of the settlement agreement. The letter stated:

> I want to summarize our conversations and agreements of this morning.
>
> First, the checks now being held by your office which are made out to Stockman Bank and Rick Potts will be endorsed by Stockman Bank. These checks, which represent the proceeds of sales of mortgaged property, will be deposited into a controlled account at Washington County Bank in Dickinson, North Dakota. That account will require the authority of both Rick Potts and Stockman Bank for release of funds.
>
> Second, Rick Potts is applying for a new guaranteed loan with Washington County Bank. He intends to pay-off the principal and interest on the note at Stockman together with attorney fees accruing from January 3, 2000.
>
> Third, the pay off arrangements cited above involve a reduction in liability on the part of Stockman Bank. This arrangement is available with the understanding that upon the pay-off, Rick Potts and Stockman Bank will execute mutual releases of all claims and a stipulation for dismissal of the current litigation, with prejudice.
>
> If I have incorrectly stated our understanding, please advise.

¶12 Although employees of the Washington County Bank told Stockman Bank's loan officer, Stanley Markuson, on February 2, 2000, that the FSA guaranteed loan application would be completed shortly, Potts subsequently had difficulty obtaining financing because of income tax liability which, according to the Potts, resulted from

5

refusal of the Bank to release proceeds from the sale of livestock so that he could pay associated expenses in the same calendar year.

¶13  Because Potts believed that this tax liability was a loss for which he was entitled to compensation, he contends that he decided to liquidate his livestock and pay the Bank in full, including attorney fees.  However, the Bank apparently believed that Potts was ready to pay in accordance with the settlement agreement, and did not learn of the difficulty with the FSA guaranteed loan until after it had released its liens.

¶14  Potts' payoff to the Bank was in the amount of $318,649.42 which included all principle and interest due plus an amount for attorney's fees which was less than the total amount claimed.

¶15  While the parties agree on the amount paid, they disagree whether Potts paid all that was due.  In his affidavit one of Potts' attorneys, W. Scott Green, states that funds were transferred to pay the Bank in full.  Markuson, on the other hand, states in his affidavit that $12,857.00 in attorney fees and costs were still owed.

¶16  Following payment, on March 23, 2000, Green faxed a letter to the Bank requesting releases of liens on vehicles held by Potts. Markuson executed a release.  According to Markuson, Patten then informed him that Potts would not release his counterclaim and stipulate to dismissal.

¶17  Although trial had been scheduled for April 17, 2000, the District Court Judge Maurice R. Colberg entered an order vacating

the trial on April 1, 2000, and noted that the District Court had been informed at the final pretrial conference that Potts had paid the debt to the Bank which resolved much of the case, but that Potts intended to pursue his counterclaim. However, on February 6, 2001, the Bank filed a Motion to Enforce Settlement and for Summary Judgment. Following a hearing, the District Court granted Stockman's motion and dismissed the remainder of the case. Potts appeals from the order of the District Court. We reverse the District Court and remand for further proceedings consistent with this opinion.

## DISCUSSION

¶18 Did the District Court err when it granted summary judgment to the Bank?

¶19 The District Court granted summary judgment based on its conclusion that the letter of January 28, 2000, constituted a settlement agreement and that the Bank was therefore entitled to a release from Potts' counterclaim because the Bank agreed to settle the case for an amount that did not include all the attorney fees to which it was entitled. Further, the District Court found that there was no contingency to the settlement. In support of this finding, the District Court cited *Hetherington v. Ford Motor Co.* (1993), 257 Mont. 395, 399, 849 P.2d 1039, 1042, for the principle that when a written agreement does not identify a contingency, the parties cannot rely on a contingency to avoid the effect of the settlement agreement.

7

¶20 Potts contends that he did not intend to settle this case and that issues of fact should have precluded summary judgment. Potts notes that his affidavit and the affidavits of his attorneys demonstrated that any settlement offer was conditioned on a new loan from Washington County Bank and that once he learned he would not qualify for a new loan based on circumstances for which he blamed Stockman Bank, he had no intention of settling his counterclaim. Moreover, Potts argues that Judge Colberg's April 1, 2000, order reflects Potts' intent to pursue his counterclaim.

¶21 There is no question but that the affidavits submitted by the parties raise an issue of material fact as to whether the settlement was contingent on Potts obtaining alternate financing. Both Green and Potts state in their affidavits that on March 22, 2000, they requested from the Bank the full amount owed, including attorney fees, so that Potts' obligation could be paid in full without settlement. Further, Judge Colberg's order suggests that Potts had paid the entire debt but that he intended to pursue his counterclaim. On the other hand, affidavits submitted by the Bank in support of its motion for summary judgment support the finding that the parties settled their dispute unconditionally. The question is whether the affidavits are relevant or whether the 1/28/00 memorandum of understanding clearly states the parties' intention so that parole evidence would be inadmissible. In interpreting a written contract, the intention of the parties must be ascertained, first and foremost from the writing alone, and resort to extrinsic evidence in aid of discovering the parties'

8

intent should be utilized only when the contract is ambiguous on its face. *See Wray v. State Comp. Ins. Fund* (1994), 266 Mont. 219, 223, 879 P.2d 725, 727.

¶22 Determining whether a contract is ambiguous – i.e., subject to more than one reasonable meaning in view of the contract as a whole – is a question of law. *See In re Marriage of Holloway*, 2000 MT 104, ¶ 5, 299 Mont. 291, ¶ 5, 999 P.2d 980, ¶ 5.

¶23 We conclude that the 1/28/00 letter when considered in combination with the parties' other correspondence, does create an ambiguity regarding whether their settlement was contingent on alternate financing.

¶24 On 1/24/00 Potts' attorney wrote to the Bank's attorney.

> As I had indicated in our conversations with Stan and you on Friday, Rick has received word from the Washington County Bank in Dickinson, North Dakota, that it would provide funds to Rick to pay the Stockman Bank $310,000. This payment would be made from a new FSA guaranteed loan which, I am informed by Mel Yost of the Montana FSA office that it will take 14 days to provide a guarantee. I just received the following fax from Washington County Bank; Mr. Miller just called and left word that FSA wants to proceed using a new guaranty.

¶25 The 1/28/00 letter relied on by the Bank and the District Court provided as follows:

> Second, Rick Potts is applying for a new guaranteed loan with Washington County Bank. He intends to pay off the principal and interest on the note at Stockman together with attorneys fees accruing from January 3, 2000.

¶26 Considering all the parties' correspondence rather than isolating one piece of correspondence, we conclude that it is subject to more than one reasonable interpretation regarding the parties' intention; that, therefore, the parties' affidavits or

9

testimony are admissible to determine their intentions; and that the parties' affidavits raise an issue of fact which precluded summary judgment for the Bank.

¶27 Accordingly, we reverse the order of the District Court and remand for further proceedings consistent with this opinion.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ KARLA M. GRAY

10

/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ JIM REGNIER

Justice Jim Rice dissenting.

¶28 I respectfully dissent.

¶29 The District Court entered summary judgment in favor of the Bank on two grounds. First, the District Court held that Potts had offered no objective evidence showing that the settlement agreement was conditioned upon his obtaining financing from Washington County Bank. Second, the District Court held that, even if the agreement was conditioned upon the financing, Potts was equitably estopped from asserting that contingency. I would affirm the District Court's entry of summary judgment on the second ground, on facts which are herein undisputed.

¶30 In addition to referencing Potts' intention to secure financing, the January 28, 2000 letter memorializing the settlement agreement included two other provisions which had been discussed during the course of the parties' negotiations. First, the letter indicated that Potts would only be responsible for the Bank's attorneys fees incurred since January 3, 2000. As the District Court noted, "[a]t this point, Stockman Bank had incurred an additional $12,857.00 in legal fees and costs that it was legally entitled to under its loan agreements with Potts," but that "Stockman Bank was willing to forego those fees and costs to settle this matter." Second, the letter stated that because the payoff amount agreed to by the parties was less than Potts' contractual liability to the Bank, "[t]his arrangement is available with the understanding that upon the pay-off, Rick Potts and Stockman Bank will execute mutual releases of all claims . . . ."

12

¶31 Thereafter, the Bank received written and verbal communication from Washington County Bank that work on Potts' financing application was in progress. However, following that communication, as early as March 10, 2000, Potts was advised that the Bank's withholding of certain livestock production proceeds related to Potts' loan, attributable to Potts for tax purposes, had created a tax liability which, according to James Patten's affidavit, "appeared to preclude financing from the Washington County Bank" for the settlement agreement. However, Stockman Bank was not advised that Potts' intended financing of the settlement agreement had been jeopardized by this development.

¶32 On March 22, 2000, Patten's law partner, Scott Green, and Potts contacted the Bank and requested, according to Green's affidavit, "a *complete* payoff of *all* liabilities owing to Stockman Bank, *including any attorney fees* or other costs. I specifically stated to Stockman Bank that it needed to include *all attorney fees* . . . ." (Emphasis added.) However, in this first communication between the parties since entering the settlement agreement, neither Potts nor his counsel informed the Bank about the income tax liability, the new claim against the Bank arising therefrom, the problem with financing the agreement through Washington County Bank, or that Potts no longer wished to act in accordance with the settlement agreement.

¶33 In response to Green's request of March 22, Stanley Markuson of the Bank faxed a handwritten "loan payoff" document back to Green on the same day. That document did not set forth the

13

*original* complete liability and attorney fees owed to the Bank by Potts, but rather, a calculation of the complete obligation owed under the parties' settlement agreement. The document noted that attorney fees included were those incurred "since 1/3/00," and noted a "total payoff" of $318,694.42, which did not include the $12,857 in legal fees and costs which the Bank had agreed to forgo as part of the settlement agreement. Potts then paid the $318,694.42. As the District Court noted, although Markuson's document had clearly reflected the amount due under the settlement agreement, neither Green, Patten nor Potts informed the Bank that "Potts no longer wished to act in accordance with the settlement agreement, but rather wished to pay the additional attorney fees and costs in order to preserve his counterclaim. Instead, without informing the Bank that Potts had not received financing from WCB, Mr. Green caused funds to be transferred to Stockman Bank in the settlement amount."

¶34 The next day, March 23, Green contacted Markuson and requested release of the liens held by the Bank. Markuson complied with this request, and also sent the original note underlying Potts' obligations to the Bank to Green, stamped "paid." On the next day, March 24, Patten informed the Bank that Potts refused to execute releases or dismiss the pending litigation.

¶35 Courts invoke the doctrine of equitable estoppel to promote justice, honesty and fair dealing. *Billings Post #1634, VFW v. Dept. of Revenue* (1997), 284 Mont. 84, 90, 943 P.2d 517, 520. Equitable estoppel is based upon the principle that "a party

14

cannot, through his intentional 'conduct, actions, language, or silence,' induce another party to unknowingly and detrimentally alter his position and then subsequently deny the just and legal consequences of his intentional acts." *Kelly v. Wallace,* **1998 MT 307, ¶ 43, 292 Mont. 129, ¶ 43, 972 P.2d 1117, ¶ 43.**  While the doctrine is not favored, and must be supported by clear and convincing evidence, *Ducham v. Tuma* (1994), 265 Mont. 436, 441, 877 P.2d 1002, 1006, the doctrine is supported by such evidence here, and its application is necessary to protect honesty and fair dealing herein.  The elements of the doctrine are as follows:

> **(1) there must be conduct, acts, language, or silence amounting to a representation or concealment of material facts; (2) these facts must be known to the party estopped at the time of his conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him; (3) the truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel at the time it was acted upon by him; (4) the conduct must be done with the intention, or at least with the expectation, that it will be acted upon by the other party, or under the circumstances that it is both natural and probable that it will be so acted upon; (5) the conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it; and (6) he must in fact act upon it in such a manner as to change his position for the worse.**

*Kelly,* **¶ 40, citing** *Dagel v. City of Great Falls* **(1991), 250 Mont. 224, 235, 819 P.2d 186, 193.  See also** *Ducham***, 265 Mont. at 441-42, 877 P.2d at 1006.**

¶36    The District Court analyzed the elements of the doctrine, and found that they had been satisfied by the facts of this case:

> First, Potts acted in conformity with the terms of the settlement agreement up to the point of refusing to execute the agreed upon release, such action amounting to a representation that there was indeed a valid agreement.

15

Second, Potts knew at least as early as March 10, 2000, of the difficulty in obtaining financing from WCB. Third, Potts did not reveal this difficulty to the Bank or to anyone representing the Bank, nor did he reveal that he no longer had the intention to act in accordance with the terms of the agreement. Rather (fourth), Potts' continued conduct in conformity with the settlement agreement created circumstances, both natural and probable, that the Bank would also continue to act in conformity with the agreement. Fifth and sixth, the Bank indeed relied upon the conduct of Potts and changed its position for the worse by releasing all claims and liens it held against Potts according to the terms of the agreement.

¶37 I agree with the District Court. Potts knowingly induced the Bank to act in accordance with the settlement agreement to its own detriment. The Bank released its liens and forgave its attorneys fees and costs, relying on Potts' promise in the settlement agreement to provide a full and complete release of Potts' claims against it. The settlement agreement's reduced payoff amount was specifically premised upon that promise. ("This arrangement is available with the understanding that upon the pay-off, Rick Potts and Stockman Bank will execute mutual releases of all claims . . . .") Although Potts had requested the Bank's calculation of the "complete" amount owed on March 22, 2000, he intentionally failed to advise the Bank that he was requesting the amount owed under the original loan obligation, not the amount due under the parties' negotiated settlement agreement. The Bank responded predictably by providing the reduced amount due under the settlement agreement, believing it would receive a release of all claims and an end to the litigation. By failing to disclose important facts and thus leading the Bank to believe that the settlement was proceeding as agreed, Potts obtained the Bank's concessions provided under the settlement agreement, but failed to deliver what he had promised in order to obtain those

16

concessions, and which the Bank believed it was receiving: a release of all of Potts' claims against it.

¶38    Potts should not now be able to assert that his inability to obtain the contemplated financing negated a settlement agreement from which he has benefitted, and by which he has caused detriment to the Bank.   I agree with the District Court that equitable estoppel should apply, and would affirm summary judgment on Potts' counterclaim.


/S/ JIM RICE


Justice W. William Leaphart dissenting.

I concur in the foregoing dissent of Justice Rice.


/S/ W. WILLIAM LEAPHART

17