# DEBORAH KOTTEL and ALBERT TUSS, Plaintiffs and Appellants,

## v.

# STATE OF MONTANA, CASCADE COUNTY TREASURER, and CASCADE COUNTY COMMISSIONERS, Defendants and Respondents.

No. 01-833.
Submitted on Briefs March 28, 2002.
Decided December 5, 2002.
2002 MT 278.
312 Mont. 387.
60 P.3d 403.

For Appellants: **Lawrence A. Anderson, Howard F. Strause,** Great Falls.

For Respondents: **Hon. Mike McGrath,** Montana Attorney General, **Chris D. Tweeten,** Civil Bureau Chief, Helena; **Brant Light,** Cascade County Attorney, **Dirk M. Sandefur,** Deputy Cascade County Attorney, Great Falls.

JUSTICE NELSON delivered the Opinion of the Court.

# I. INTRODUCTION

¶1 Appellants Deborah Kottel and Albert Tuss (hereinafter Taxpayers) appeal an order of the Eighth Judicial District Court, Cascade County, granting summary judgment to the Respondents State of Montana, Cascade County Treasurer, and Cascade County Commissioners (hereinafter State) on the issue of the constitutionality of § 20-25-439(1), MCA. We affirm.

¶2 We address the following issues on appeal:

¶3 1. Did the District Court err in holding that, for purposes of this case, equal protection analysis and the requirements of Article VIII, Sections. 1 and 3, are the same?

¶4 2. Did the District Court err in holding that § 20-25-439(1), MCA, does not violate the guarantees of equal protection in Article II, Section 4 of the Montana Constitution and the Fourteenth Amendment, Section 1 of the United States Constitution?

# II. FACTUAL AND PROCEDURAL BACKGROUND

¶5 Under § 20-25-301, MCA, Montana has one state-wide university system which is supervised by the Board of Regents. This university system includes vocational technical schools (vo-techs), officially called colleges of technology, located in Cascade, Lewis and Clark, Missoula, Silver Bow, and Yellowstone counties. Under § 20-25-439(1), MCA, (the vo-tech levy), both real and personal property in these five counties is subject to a mandatory tax of 1.5 mills that provides partial funding for the vo-techs. The amounts generated by the vo-tech levy are deposited into the general fund to be distributed to the vo-techs for educational purposes on the basis of budgets approved by the Board of Regents. The Board of Regents is not required to allocate to a particular vo-tech an amount of funding equal to that generated by the vo-tech levy in the corresponding county. The funds generated by the vo-tech levy provide less than five percent of the total annual funding for vo-techs. In addition to the vo-tech levy and university appropriations approved by the Legislature under § 17-7-138, MCA, and § 20-25-422, MCA, there is also a state-wide 6-mill levy authorized under § 20-25-423, MCA, that provides partial funding for the entire university system.

¶6 The Taxpayers in this case reside in Cascade County, own property subject to the vo-tech levy, and paid the tax under protest pursuant to § 15-1-402, MCA. The Taxpayers then instituted this declaratory judgment action, asserting that the vo-tech levy is unconstitutional because it is only required and levied in the five counties where the vo-techs are located even though the vo-techs are part of the state-wide university system. The State answered and

asserted that the vo-tech levy is not unconstitutional because it is rationally related to a legitimate government purpose.

¶7   Agreeing that the issue is purely a question of law, the parties stipulated to certain underlying facts and made cross motions for summary judgment. The District Court agreed with the State and held that the vo-tech levy does not violate Montana's Constitution or the United States Constitution. The Taxpayers then appealed to this Court. Further facts, including a discussion of the relevant history of the vo-tech system, are included below.

## III. STANDARD OF REVIEW

¶8   We review a grant of summary judgment *de novo*. *Stockman Bank v. Potts*, 2002 MT 178, ¶ 3, 311 Mont. 12, ¶ 3, 52 P.3d 920, ¶ 3. We review a district court's conclusions of law to determine whether those conclusions are correct. *Albright v. State* (1997), 281 Mont. 196, 205, 933 P.2d 815, 821. In this case, the grant of summary judgment is based entirely on conclusions of law interpreting provisions of the Montana Constitution and the federal Constitution. Therefore, we review the District Court's order here to determine whether it is correct. Further, we will affirm the District Court's ruling if it reached the correct result for the wrong reason. *Eschenbacher v. Anderson*, 2001 MT 206, ¶ 40, 306 Mont. 321, ¶ 40, 34 P.3d 87, ¶ 40.

¶9   Constitutional provisions are interpreted by use of the same rules as those used to interpret statutes. *Great Falls Tribune Co. v. Great Falls Pub. Schs.* (1992), 255 Mont. 125, 128-29, 841 P.2d 502, 504. First, we look to precedent that has already interpreted the provision at issue. If none addresses the issue, we look to the plain meaning of the provision and to legislative intent. *Department of Revenue v. Puget Sound Power & Light Co.* (1978), 179 Mont. 255, 263, 587 P.2d 1282, 1287. In this case, the relevant legislative intent is the intent of the Constitutional Convention. When interpreting the plain meaning or determining legislative intent, we consider canons of construction and maxims of law. For example, one such rule is that a statute is presumed constitutional. *Roosevelt v. Montana Dep't of Revenue*, 1999 MT 30, ¶ 26, 293 Mont. 240, ¶ 26, 975 P.2d 295, ¶ 26; *McGowan v. Maryland* (1961), 366 U.S. 420, 425-26, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393, 399. Therefore, the burden in this case is on the Taxpayers to prove that § 20-25-439(1), MCA, is unconstitutional. *Roosevelt*, ¶ 26.

## IV. DISCUSSION
### A. The History of the Vo-Tech System and § 20-25-439, MCA.

¶10  The current vo-tech levy mandated by § 20-25-439, MCA, reads:

Vocational-technical education–mill levy required.

(1) Subject to 15-10-420, the boards of county commissioners of Cascade, Lewis and Clark, Missoula, Silver Bow, and Yellowstone Counties shall in each calendar year levy a tax of 1 ½ mills on the dollar value of all taxable property, real and personal, located within the respective county.

(2) The funds from the mill levy must be deposited in the general fund and must be distributed for vocational-technical education on the basis of budgets approved by the board of regents[1].

As support for each of their arguments, the Taxpayers call this Court's attention to the funding and management history of the vo-tech system that culminated in the current vo-tech levy embodied in § 20-25-439, MCA. In order to properly address the Taxpayers' arguments, we first recount that history here.

¶11 Montana's vo-tech system originated in 1917 when the Legislature authorized the then State Board of Education to cooperate with local school districts and county school boards in the establishment and maintenance of vo-techs in the public schools of the state. Sec. 2, Ch. 102, L. 1917. The State Board of Education was authorized to adopt rules regarding course offerings, teacher certification and other matters, while the local counties were left to manage the vo-techs. Sec. 3, Ch. 102, L. 1917. Initially, funding for vo-techs came from federal sources. Sec. 4, Ch. 102, L. 1917.

¶12 In 1969, the Legislature designated the present day vo-techs and gave local counties with vo-techs discretionary authority to levy a 1-mill property tax to support the vo-tech in their community. Secs. 4 & 9, Ch. 250, L. 1969. After gradually increasing the taxing authority to 1.5 mills over the years, the Legislature made the vo-tech levy mandatory in 1986. Sec. 1, Ch. 27, Sp. L. June 1986.

¶13 In 1987, the Legislature transferred control of the vo-techs to the Board of Regents. Sec. 1, Ch. 658, L. 1987. Local administrative control was removed from the counties and placed with the Board of Regents. Secs. 1 & 15, Ch. 658, L. 1987. Vo-tech employees became employees of the Board of Regents. Sec. 5, Ch. 658, L. 1987. Further, the amounts generated by the vo-tech levy were placed under control of the Board of Regents rather than the local districts. Sec. 18, Ch. 658, L. 1987. In 1995, the Legislature merged the vo-techs into the state university

---

[1] While the parties and the District Court alternately and inconsistently cite either § 20-25-439(1), MCA, or § 20-25-439(2), MCA, in their discussions, our decision today refers to § 20-25-439(1), MCA, because this is the subsection that requires the five counties to actually collect the vo-tech levy.

system, removed all statutory references to "vocational technical centers" as separate entities, and instead designated vo-techs as units of either Montana State University or the University of Montana. Secs. 7, 11, 15, Ch. 308, L. 1995. This allowed the Board of Regents to rename the vo-techs as "colleges of technology." At the same time, the vo-tech levy was also recodified from § 20-7-324(1)(b), MCA (1993) to § 20-25-439, MCA. Sec. 34, Ch. 308, L. 1995.

¶14 The Taxpayers assert this history demonstrates a long tradition of local control, funded in part by the local, discretionary tax embodied in § 20-7-324(1)(b), MCA (1985), the earlier version of § 20-25-439, MCA. The Taxpayers further note the system of local control was converted to a state-run system at almost the same time as the vo-tech levy was converted to a mandatory state tax. The Taxpayers assert that the removal of local control should have been accompanied by a removal of the five-county vo-tech levy or possibly expansion of the vo-tech levy to all counties with university system operations or to all 56 counties. At any rate, the Taxpayers assert that retention of the mandatory vo-tech levy in only five counties results in a statute that violates the tax provisions of Article VIII, Sections 1 and 3 and the equal protection provisions of the Montana and federal Constitutions because the property owners in these five counties carry a disproportionate share of the burden to support the state-wide university system.

¶15 The State responds that while the vo-tech schools are now part of the university system, the schools benefit their local communities more than the state in comparison to the larger university system units. The State points out that vo-tech courses tend to be vocational and technical courses useful to a broad cross-section of workers in the local economy. Further, vo-tech students tend to be older, non-traditional students who are local residents. Consequently, the State asserts that the vo-tech levy is rationally related to the legitimate government purpose of funding vo-techs and is not unconstitutional.

¶16 **B. Did the District Court err in holding that, for purposes of this case, equal protection analysis and the requirements of Article VIII, Sections 1 and 3 are the same?**

¶17 Because the Taxpayers challenge the meaning of the current 1972 Constitution based on provisions from the 1889 Constitution, we first set out the provisions in issue. Article XII of the 1889 Constitution is entitled "Revenue and Taxation." Section 1 reads:

The necessary revenue for the support and maintenance of the state shall be provided by the legislative assembly, which shall

levy a uniform rate of assessment and taxation, and shall prescribe such regulations as shall secure a just valuation for taxation of all property, except that specially provided for in this article.

Article XII, Section 11 of the 1889 Constitution reads:

Taxes shall be levied and collected by general laws and for public purposes only. They shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax.

Article VIII of the 1972 Constitution is entitled "Revenue and Finance." Section 1, entitled "Tax purposes" reads:

Taxes shall be levied by general laws for public purposes.

Article VIII, Section 3 of the 1972 Constitution entitled "Property tax administration" reads:

The state shall appraise, assess, and equalize the valuation of all property which is to be taxed in the manner provided by law.

Further, the 1972 Constitution equal protection clause is in Article 2, the Declaration of Rights. It reads:

Section 4. Individual dignity.... *No person shall be denied the equal protection of the laws.* Neither the state nor any person, firm, corporation, or institution shall discriminate against any person in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas. (emphasis added)

In contrast, unlike the 1972 Constitution, the 1889 Constitution did not contain an equal protection clause. LARRY M. ELISON AND FRITZ SNYDER, THE MONTANA STATE CONSTITUTION: A REFERENCE GUIDE, 35 (2001).

¶18 Given these provisions, the parties agree that the word "uniform" no longer appears in the plain language of the 1972 Constitution. However, the parties disagree over the meaning of relevant case law and the history of the Constitutional Convention, both of which we discuss below.

**1. The Parties' Positions and the District Court Holding**

¶19 The Taxpayers' first argument is based on their theory that § 20-25-439(1), MCA, violates the "uniformity doctrine." First, they assert that the uniformity doctrine was incorporated into the language of Article XII, Sections 1 and 11 of the 1889 Montana Constitution. They note that this doctrine requires a tax to be levied by a general law which is uniform within the same class of subjects within the territorial limits of the authority levying the tax. *Hilger v. Moore* (1919), 56 Mont. 146, 182 P. 477.

¶20 The Taxpayers further assert that the uniformity doctrine is still a constitutional requirement in this state under the language of Article VIII, Sections 1 and 3 in the 1972 Montana Constitution. In support of this position, the Taxpayers cite post-1972 case law decided under Article VIII, Sections 1 and 3 that preserves the uniformity doctrine as it was interpreted by our pre-1972 case law decided under Article XII, Sections 1 and 11. Accordingly, the Taxpayers assert that these cases incorporate the uniformity doctrine into the phrase "general laws" in Article VIII, Section 1 and the phrase "equalize" in Article VIII, Section 3. The Taxpayers therefore argue that this precedent is binding on this Court. In addition, the Taxpayers assert that this doctrine is a requirement apart from equal protection guarantees.

¶21 Assuming then that the uniformity doctrine is part of the 1972 Constitution, the Taxpayers argue that § 20-25-439(1), MCA, violates the uniformity doctrine because it is not uniform within the same class of subjects within the territorial limits of the authority levying the tax. Specifically, they assert that despite the fact that § 20-25-439(1), MCA, is a tax mandated by the state and the fact that the university system is one state-wide system supervised by the Board of Regents under § 20-25-301, MCA, the tax is not levied on a state-wide basis, but only in five of Montana's 56 counties. Therefore, the five vo-tech counties are not treated uniformly with other counties, but are required to carry a heavier tax burden to support the state-wide vo-tech system than the burden carried by the rest of the state.

¶22 The State counters that the uniformity doctrine is not part of Montana's 1972 Constitution and that therefore, the vo-tech levy cannot violate the doctrine. In support of its argument, the State cites to the Constitutional Convention history of Article VIII, Section 1 in which the Convention delegates intentionally deleted the uniformity language, believing equal protection guarantees to be adequate. The State further argues that the "general laws" phrase in Article VIII, Section 1 has been interpreted by this Court to have independent meaning from the uniformity sentence and is intended to prohibit special legislation. The State also asserts that the equalization provision in Article VIII, Section 3 is intended to address the valuation of property. Finally, the State argues that the analysis under Article VIII, Sections 1 and 3 of the issue presented here is the same as the analysis under equal protection.

¶23 The District Court held that the uniformity doctrine as found in the 1889 Constitution is no longer contained within of the 1972 Constitution. Further, the court held that the analysis under the general laws requirement of Article VIII, Section 1 is the same as the

analysis under equal protection. While we determine the District Court erred with regard to the uniformity language, we ultimately affirm because we hold that the District Court reached the correct result for the wrong reasons as discussed below.

## 2. The Uniformity Doctrine and Equal Protection in Taxation

### a. Pre-1972 Case Law

¶24 As mentioned above, we first look to case law that has already interpreted Article VIII, Sections 1 and 3. However, because the Taxpayers assert that current case law interpreting Article VIII, Sections 1 and 3, simply preserves the uniformity doctrine as already established by pre-1972 case law, we turn to the pre-1972 cases.

¶25 The Taxpayers first cite *Hilger*, one of the original cases to interpret Article XII, Sections. 1 and 11, in order to define the uniformity doctrine. The Taxpayers call our attention to the statement in *Hilger* that under Article XII, Sections 1 and 11, "all taxes shall be levied and collected by general laws and for public purposes only, and that they shall be uniform upon the same class of property within the territorial limits of the authority levying the tax." *Hilger*, 56 Mont. at 170, 182 P. at 482. We agree that this statement defines the uniformity doctrine as it was interpreted under the 1889 Constitution and we agree that this requirement has been applied in our post-1972 cases. However, we disagree that this definition supports any stricter limitations on taxation than those imposed by equal protection. Consequently, while we agree with the Taxpayers that the uniformity doctrine is preserved in our current case law, we disagree that this doctrine imposes a rule which requires reversal of the District Court. This conclusion is based on our analysis of *Hilger* and other case law as discussed below.

¶26 First, in making our holding in *Hilger*, we specifically rejected a strict interpretation of the uniformity requirements of Article XII, Sections 1 and 11. Rather, the Court set out the traditionally restrictive definition of the uniformity doctrine and then proceeded to reject that definition. The Court defined the restrictive definition by stating: "If A and B each owned taxable property of the same value within the same taxing district, each should pay thereon precisely the same amount of tax, without reference to the character of the property." *Hilger*, 56 Mont. at 164, 182 P. at 479. The Court then rejected applying this definition in Montana when it stated "the ironclad rule of uniformity ... never prevailed in this state." *Hilger*, 56 Mont. at 171, 182 P. at 482. Therefore, this Court long ago rejected the notion that actual assessed taxes must be equal regardless of the

character of property.

¶27  Second, the facts of *Hilger* support a less restrictive interpretation of Article XII, Sections 1 and 11. Specifically, we upheld an act of the Legislature that divided property into seven different classifications, each taxed at a different rate, against a challenge that the Legislature was "without authority to classify property for purposes of taxation." *Hilger*, 56 Mont. at 163, 182 P. at 479. Rather, we held the classification scheme met the constitutional requirements of the uniformity language in Article XII, Sections 1 and 11.

¶28  Third, other language in *Hilger* makes clear that this Court adopted a less restrictive interpretation of Article XII, Sections 1 and 11. For example, the Court stated "[t]axation for the purpose of raising public revenue is a subject peculiarly and inherently of legislative cognizance." *Hilger*, 56 Mont. at 163, 182 P. at 479.

¶29  Fourth, as mentioned above, the 1889 Constitution did not contain its own equal protection clause. Consequently, this Court's reliance in *Hilger* on federal equal protection cases in support of its decision under Article XII, Sections 1 and 11 indicates that the rights protected were the same. *See Hilger*, 56 Mont. at 173, 182 P. at 483 (*citing Kentucky Railroad Tax Cases* (1885), 115 U.S. 321, 336, 6 S.Ct. 57, 63, 29 L.Ed. 414 and *Pacific Express Co. v. Seibert* (1892), 142 U.S. 339, 351, 12 S.Ct. 250, 253, 35 L.Ed. 1035.) In fact, one of the federal cases *Hilger* relies on explicitly states that the protections under the federal equal protection clause and another state's similar uniformity clause were the same. *Pacific Express*, 142 U.S. at 350-51, 12 S.Ct. at 253.

¶30  ▉ Finally, the Court stated the rule under Article XII, Sections 1 and 11 essentially the same way as the requirements under equal protection are stated. *Hilger* states "Construing the first sentence of [Art. XII] section 1 with section 11 the meaning is reasonably clear: The taxes levied shall be uniform upon the same class of property within the same taxing district." *Hilger*, 56 Mont. at 170, 182 P. at 481. *Compare Charleston Federal Sav. & Loan Ass'n v. Alderson* (1945), 324 U.S. 182, 190, 65 S.Ct. 624, 629, 89 L.Ed. 857 (equal protection strikes down "taxation which in fact bears unequally on persons or property of the same class."). Therefore, in contrast to the District Court, we conclude that the uniformity doctrine as interpreted under the 1889 Constitution provided for equal protection in the area of taxation and accordingly is still embodied in our 1972 Constitution.

¶31  Our conclusion that the uniformity requirements of the 1889 Constitution provided for equal protection is supported by the cases decided subsequently to *Hilger*. In *State v. North Am. Car Corp.* (1945), 118 Mont. 183, 164 P.2d 161, for example, we considered a tax that

treated railroad cars differently based on ownership. We stated that a tax is not "uniform" when a different rate or valuation method is applied to like property within the same taxing district. *North Am. Car Corp.*, 118 Mont. at 193, 164 P.2d at 166. We then determined the discrimination at issue there similarly violated equal protection and the rule of uniformity in the state constitution and we again cited federal equal protection cases in support of our conclusion. *North Am. Car Corp.*, 118 Mont. at 194, 164 P.2d at 166 (citing *Northwestern Mut. Life Ins. Co. v. Wisconsin* (1918), 247 U.S. 132, 38 S.Ct. 444, 62 L.Ed. 1025). *See also Yellowstone Pipe Line Co. v. State Bd. of Equalization* (1960), 138 Mont. 603, 620-21, 358 P.2d 55, 64 (citing *Hilger* and holding "The rule of uniform taxation according to value does not prevail in Montana" under Article XII. Sections 1 and 11); *Hart Refineries v. Harmon* (1928), 81 Mont. 423, 425-30, 263 P. 687, 688-89 (gas tax discrimination analysis is essentially the same under equal protection, Article XII, Section 11, and under the 1889 Constitution's prohibition against special laws, Article V, Section 26).

### b. Post-1972 Case Law

¶32 The post-1972 cases interpreting Article VIII, Sections 1 and 3, cited by the Taxpayers also support the conclusion that uniformity requirements are equivalent to equal protection requirements. For example, in *Department of Revenue v. Puget Sound Power & Light Co.* (1978), 179 Mont. 255, 270, 587 P.2d 1282, 1291, we stated: "Uniformity of taxation among like taxpayers on like property is still a constitutional necessity." In making this statement, we cited Article VIII, Section 3 of the 1972 Constitution. In that case we were specifically considering a claim regarding whether a large utility was being unfairly treated by being excluded from a lower-rate tax class for new industrial properties. Our uniformity comment was made in the context of emphasizing that arbitrary classifications violate equal protection and we held that the utility was unfairly excluded because it qualified under the requirements of the class outlined by the Legislature. *Puget Sound*, 179 Mont. at 270, 587 P.2d at 1289-91. *See also Patterson v. State* (1976), 171 Mont. 168, 171-77, 557 P.2d 798, 801-03 (analyzing property valuation system under Article VIII, Section 3 and treating "uniform" appraisal as requiring equal protection); *Roosevelt,* ¶ 19-20; *Montana Dep't of Revenue v. Barron* (1990), 245 Mont. 100, 799 P.2d 533; *Montana Dep't of Revenue v. Sheehy* (1993), 262 Mont. 104, 862 P.2d 1181 (guaranteeing equal protection under Article VIII, Section 3, by striking down property valuation systems that are not uniform because like taxpayers are not assessed alike, therefore resulting taxes would not be the same on

taxpayers in the same class).

¶33 In arguing that the uniformity rule requires something more than equal protection, the Taxpayers cite language from *Hilger* that "[t]he entire state is one district for the purposes of raising state taxes." *Hilger*, 56 Mont. at 170, 182 P. at 481. Consequently, the Taxpayers argue that any state tax must apply to every county. The Taxpayers cite *State ex rel. Woodahl v. Straub* (1974), 164 Mont. 141, 520 P.2d 776, in support of the position the such an interpretation survives in the 1972 Constitution.

¶34 ■ Again, we agree that the state is one district for taxing purposes. However, we disagree that this requirement varies from equal protection requirements. In *Woodahl* we considered and upheld the constitutionality of a state-wide levy for the state's share of funding for public elementary and secondary schools. *Woodahl*, 164 Mont. at 151, 520 P.2d at 781. We held that the levy was a "general law" under Article VIII, Section 1, because it required all property in the state to be "levied [on] at the same rate." *Woodahl*, 164 Mont. at 151, 520 P.2d at 781. However, this statement does not require that the state is limited to making state-wide tax classifications that inevitably apply to every county in the state and inevitably levy all property at the same rate. *See Powder River County v. State*, 2002 MT 259, ¶ 92, 312 Mont. 198, ¶ 92, 60 P.3d 357, ¶ 92 (analyzing *Hilger* and *Woodahl*). Rather, this statement verifies that the levy in question did not violate equal protection because it did not treat property differently. Further, this statement was simply part of the background fundamentals of state taxation power leading up to the main point of contention, whether levy collections from one county could be allowed to fund schools in other counties by virtue of a state-wide levy. *Woodahl*, 164 Mont. at 151, 520 P.2d at 781. Therefore, neither uniformity requirements nor equal protection prevent the state from making classifications that result in different state taxes among the various counties of the state, as long as those classifications are rationally related to legitimate government purposes.

### c. Constitutional Convention History

¶35 In addition to precedent, the Constitutional Convention history also supports our conclusion here. The Taxpayers assert that the delegates of the Constitutional Convention intended to create a more concise document in the 1972 Constitution and therefore the uniformity rule is still incorporated in our current Constitution. Again, we agree that the framers intended to create a more concise document and we agree that the uniformity rule is preserved, but again, we disagree that it requires anything greater than equal protection.

¶36 The intent to create a concise document is clearly expressed in the Revenue and Finance Committee proposals, all of which were adopted by the whole Convention. *See* II Montana Constitutional Convention (Mont. Const. Conv.), Revenue and Finance Committee (hereinafter Committee), Transmittal Letter, 578 ("[the Committee] condensed the language of other provisions."); II Mont. Const. Conv., Committee Proposal, Introduction, 579 ("[T]he committee recommends a condensed, single article of only 14 sections [as opposed to 3 articles of 42 sections]. Naturally, that means the committee eliminated or abandoned many sections in the present Constitution."); VII Mont. Const. Conv., Verbatim Transcript 2937-38.

¶37 Further, the particular history of Article VIII, Section 1 indicates that the omission of the second sentence of previous Article XII, Section 11, was still intended to preserve equal protection requirements. The Committee expressed its specific intent regarding the current Article VIII, Section 1, as follows:

> The first sentence [of Art. XII, Sec. 11] is now proposed section 1. The uniformity philosophy in the second sentence was eliminated, *primarily because uniformity of taxation is already required of the states through the 14th Amendment to the United States Constitution.* The proviso also unnecessarily thwarts taxation programs, and *has caused considerable consternation in other states.* The Pennsylvania Supreme Court invalidated an inheritance tax program as violative of the uniformity provision. The Illinois uniformity clause was interpreted to prohibit a graduated income tax in that state. (emphasis added).

II Mont. Const. Conv., Committee Proposal, 582. Rather than resurrect the "ironclad" rule of uniformity expressly rejected 53 years earlier, this history indicates that the delegates intended to eliminate any future confusion that could be caused by retaining the uniformity language as it existed in Article XII, Section 11 of the 1889 Constitution. *See also* V Mont. Const. Conv., Verbatim Transcript, 1378 ("[W]e have also eliminated the uniformity clause.... under the present Constitution it's been unattainable.") Further, this history does not express an intent to nullify the state's extensive tax jurisprudence, but instead demonstrates that the framers acted with a knowledge of existing Montana and federal law. *Rankin v. Love* (1951), 125 Mont. 184, 187, 232 P.2d 998, 1000; *see also Powder River, passim* (relying on tax jurisprudence decided before 1972).

¶38 Other passages of the Convention history indicate that in addition to creating a more concise document, the delegates also intended to give the state even more flexibility regarding its tax policies. *See e.g.*

II Mont. Const. Conv., Committee, Intro. 579-80 ("For 80 years, the Constitution required taxation of all property. That mandate was difficult to live up to.... [T]he legislature shall decide what property to tax and how to tax it."); II Mont. Const. Conv., Committee Proposal Comments, 591 (regarding Article VIII, Section 5 that now allows the Legislature to exempt any class of property: "The proposed provisions ... leav[e] the scope and nature of taxation programs up to the Legislature."); V Mont. Const. Conv., Verbatim Transcript, 1376-78 ("The committee felt that [the tax article] should be flexible enough so that future Legislatures would not be restricted for many years to come.... So our thinking now is that the Legislature is now free to tax whatever form or class of property it so desires and they can define it at the time they make the law."); V Mont. Const. Conv., Verbatim Transcript, 1378 ("[Y]ou can have a tax on a special subject, but it has to be broadly based across the state.").

¶39 ▆▆ Accordingly, based on our review of case law and Constitutional Convention history, we conclude that the framers intended to preserve the uniformity rule only as it is equivalent to equal protection requirements and also intended to remove any confusion that could lead to other conclusions, such as the position asserted by the Taxpayers in this case. Therefore, we hold that the District Court erred when it determined that the protections of the uniformity rule are no longer in Article VIII, Sections 1 and 3, of our current Constitution.

### 3. The Analysis is the Same Under Article VIII, Sections 1 and 3, and Under Equal Protection for this Case

¶40 Even though the District Court held that the uniformity rule was not preserved in Article VIII, Sections 1 and 3, the court still held that the remaining analysis under Article VIII, Sections 1 and 3, was the same as an equal protection analysis. Although we agree based on the opposite grounds that the uniformity rule and equal protection are one in the same, either holding gives rise to a problem in that both holdings create surplus language in the Constitution. The District Court holding that § 20-25-439(1), MCA, is not special legislation also creates the same problem.

¶41 Normally, we follow the rule that we do not construe a provision to create surplus language. Said another way, interpretations that give effect to all the language are preferred over interpretations that treat language as void. *Hawley v. Board of Oil and Gas Conservation*, 2000 MT 2, ¶ 12, 297 Mont. 467, ¶ 12, 993 P.2d 677, ¶ 12. *See also* § 1-2-101, MCA; § 1-3-232, MCA. Under this rule, Article VIII, Sections 1 and 3, must have meaning independent from the equal protection clause.

However, our review of the case law above indicates that the analysis is often the same. Said another way, the question of whether a law is a "general law" is simply another approach to the question of whether a law violates equal protection by unfairly discriminating against a specific person. *See Woodahl*, 164 Mont. at 151, 520 P.2d at 781. Further, the question of whether property appraisals are "equalized" is another approach to the question of whether an appraisal system violates equal protection. *See Roosevelt*, ¶¶ 19-21.

¶42 The same parallel also applies to the analysis of whether a law is "special" in violation of Article V, Section 12. *Linder v. Smith* (1981), 193 Mont. 20, 30, 629 P.2d 1187, 1192 (reasonable classifications will be upheld against a "special legislation" challenge or against an equal protection challenge); *D & F Sanitation Serv. v. Billings* (1986), 219 Mont. 437, 442, 713 P.2d 977, 980 (a law is special if it does not "operate equally upon all of a group of objects which, having regard to the purpose of the legislature, are distinguished by characteristics sufficiently marked and important to make them a class by themselves.") *Compare Hart Refineries*, 81 Mont. at 425-30, 263 P. at 688-89 (analysis is essentially the same under equal protection, Article XII, Section 11, and under the 1889 Constitution's prohibition against special laws, Article V, Section 26, when reviewing a gas tax for discriminatory treatment); *State ex rel. Redman v. Meyers* (1922), 65 Mont. 124, 210 P. 1064 (special law relates to less than a "class"); *State ex rel. Federal Land Bank v. Hays* (1929), 86 Mont. 58, 282 P. 32. Therefore, for purposes of this case, there is no difference between Article VIII, Sections 1 and 3 and equal protection analysis.

¶43 This conclusion is supported by the rule that language is presumed to have the same meaning throughout a document. *State ex rel. Bitter Root Valley Irrigation Co. v. Fourth Judicial Dist.* (1915), 51 Mont. 305, 152 P. 745; *Brown v. Gardner* (1994), 513 U.S. 115, 118, 115 S.Ct. 552, 555, 130 L.Ed.2d 462. In the Montana Constitution, the word "general" is used throughout. In each instance, other than referring to the Attorney General or general elections, the word "general" is used to require a law that does not single out particular individuals for special treatment. For example, Article V, Section 12, reads: "The legislature shall not pass a special or local act when a *general* act is, or can be made, applicable." This provision assures equal protection by requiring general laws. *See also* Art. XIII, Sec. 1(1) ("Corporate charters shall be granted, modified, or dissolved only pursuant to *general* law."); Art. X , Sec. 11(2) ("No such land or any estate or interest therein shall ever be disposed of except in pursuance of *general* laws providing for such disposition."); Art. V, Sec. 11 ("(3)

Each bill, except *general* appropriation bills and bills for the codification and *general* revision of the laws, shall contain only one subject, clearly expressed in its title.... (4) A *general* appropriation bill shall contain only appropriations for the ordinary expenses of the legislative, executive, and judicial branches, for interest on the public debt, and for public schools.").

¶44 Further, identical analysis under the general laws provision of Article VIII, Section 1 and under equal protection is also supported by history from the Constitutional Convention. The Committee Comments on the Majority Proposal state: "The requirement of general laws for public purposes extends to all tax programs, both state and local. Although those two requirements are already imposed on the state by the federal Constitution, repetition in the state document emphasizes their importance." II Mont. Const. Conv. 588. *See also* II Mont. Const. Conv. 579 ("From a pure, theoretical viewpoint, the Constitution does not have to say a thing about taxation.... Anything in a state Constitution on the subject of taxation is either redundant (reiterating a power already possessed by the state) or restrictive.")

¶45 ▮ Therefore, even though we hold that the District Court erred when it determined the uniformity doctrine is no longer included in our current Constitution, we also conclude that the District Court was correct in holding that the analysis under Article VIII, Sections 1 and 3, and under equal protection is the same for purposes of this case. We now turn to the issue of whether § 20-25-439(1), MCA, violates equal protection.

¶46 **C. Did the District Court err in holding that § 20-25-439(1), MCA, does not violate the guarantees of equal protection in Article II, Section 4 of the Montana Constitution and the Fourteenth Amendment, Section 1 of the United States Constitution?**

¶47 Again, we begin by setting out the provisions in issue. The federal equal protection clause reads:

> Section 1.... [N]or shall any state ... deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1. The state equal protection clause contained in Article II, the Declaration of Rights, reads:

> Section 4. Individual dignity.... *No person shall be denied the equal protection of the laws.* Neither the state nor any person, firm, corporation, or institution shall discriminate against any person in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas. (emphasis added)

Mont. Const. Art. II, Sec. 4. In setting out these provisions, we note that the Taxpayers do not assert that the state equal protection clause provides greater protection than the federal Constitution. The Taxpayers do assert, however, that § 20-25-439(1), MCA, violates each clause independently, citing both federal and state case law. Because the parties do not present the issue of whether the state clause provides broader protection, because the District Court held that the provisions are governed by generally comparable principles, and because our tax precedent treats them the same, *see e.g. GBN, Inc. v. Montana Dep't of Revenue* (1991), 249 Mont. 261, 266, 815 P.2d 595, 597, we do not draw a distinction for purposes of this case.

### 1. The Parties' Positions and the District Court Holding

¶48 The Taxpayers assert that the vo-tech levy violates equal protection based on the same facts as discussed above. Basically, they assert that § 20-25-439(1), MCA, violates equal protection under either middle tier or rational basis scrutiny because property owners in only five counties are providing support to a state-wide, post-secondary educational system. The Taxpayers further assert that the counties chosen for the vo-tech levy establish an arbitrary classification and therefore, the vo-tech levy is not a general law. The State asserts that the rational basis test applies and that the vo-tech levy is constitutional because it is rationally related to a legitimate government interest.

¶49 The District Court held that the vo-tech levy is rationally related to the legitimate government interest of supporting the vo-techs because the vo-techs provide specific benefits to their individual counties.

### 2. Rational Basis versus Middle Tier Scrutiny

¶50 First, we must address whether rational basis or middle tier scrutiny applies. The Taxpayers assert that middle tier scrutiny applies because Article VIII, Sections 1 and 3, implicate "constitutionally significant interests." Under *Butte Community Union v. Lewis* (1986), 219 Mont. 426, 434, 712 P.2d 1309, 1314, we held that if "constitutionally significant interests are implicated by governmental classification," there must a balancing of the rights infringed and the governmental interest. Further, in *Montana Envtl. Info. Ctr. v. Department of Envtl. Quality*, 1999 MT 248, ¶ 57, 296 Mont. 207, ¶ 57, 988 P.2d 1236, ¶ 57, we held that a constitutionally significant interest is implicated when a right is not in the Declaration of Rights in Article II, but is referred to in the Constitution. The Taxpayers cite *Roosevelt* in support of their argument that constitutionally significant interests are implied by Article VIII,

Sections 1 and 3. The State asserts that the District Court was correct in holding the rational basis test applies because no constitutionally significant interests are implicated.

¶51 ■ We agree that rational basis analysis applies. We have already addressed the issue of what level of scrutiny generally applies to tax classifications. In *Montana Stockgrowers Ass'n v. Department of Revenue* (1989), 238 Mont. 113, 777 P.2d 285, the Stockgrowers asserted that constitutionally significant interests were implicated because agricultural interests are specifically mentioned in Article XII, Section 1. We disagreed and held that an equal protection challenge to the property tax treatment afforded livestock was subject to the rational basis test. We stated: "The [agricultural] language provides a broad directive whose specifics are implemented through legislative decision, not by constitutional mandate. Thus, it is in no sense a self-executing provision which can be enforced by this Court." *Montana Stockgrowers*, 238 Mont. at 117, 777 P.2d at 288.

¶52 The same rationale applies in this case. The constitutional tax provisions in issue, Article VIII, Sections 1 and 3, are broad directives whose specifics are left to the Legislature. Therefore, no constitutionally significant interests are implicated that require greater than rational basis analysis. We note in making this holding that *Roosevelt* is distinguishable because we specifically declined to address the level of scrutiny applicable when we held the discrimination addressed there was unsupportable even under the lowest scrutiny. *Roosevelt*, ¶ 32.

### 3. The Vo-Tech Levy Has a Rational Basis

¶53 ■ Having determined that the vo-tech levy is to be reviewed for a rational basis, we now turn to the merits. It has long been the rule that the equal protection clause does not forbid classifications. *McGowan v. Maryland* (1961), 366 U.S. 420, 425-26, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393, 399; *Montana Beer Retailers' Protective Ass'n v. State Bd. of Equalization* (1933), 95 Mont. 30, 25 P.2d 128. Rather, it prevents arbitrary or discriminatory government classifications that treat people differently "who are in all relevant respects alike." *McGowan*, 366 U.S. at 425-26, 81 S.Ct. at 1105.

¶54 ■ In making property tax classifications, the Legislature has broad discretion. *O'Connell v. State Bd. of Equalization* (1933), 95 Mont. 91, 115, 25 P.2d 114, 119-20. Indeed, legislatures are presumed to have acted within their constitutional power despite the fact that such tax laws result in some inequality. *McGowan*, 366 U.S. at 425-26, 81 S.Ct. at 1105. In considering the property taxes at issue in *Montana*

*Stockgrowers* we stated:

> Equal protection of the law is seldom, if ever, obtained; and because of the very frailty of human agencies, the authorities all recognize the right of the legislative branch of government to make reasonable classifications of subjects, for property or occupation taxes and if the classification is reasonable, and if all of the subjects within a given class are accorded the same treatment, the legislation cannot be said to deny to anyone within such class the equal protection of the law, even though the burden imposed upon him may be more onerous than that imposed upon a member of another class. But to justify such discriminatory legislation, and avoid the condemnation of the Fourteenth Amendment to the federal Constitution, the classification must be reasonable--that is, must be based upon substantial distinctions which really make one class different from another.

*Montana Stockgrowers*, 238 Mont. at 118, 777 P.2d at 288-89 (citations omitted).

¶55 ▇ In sum, we will uphold a tax classification under the rational basis test if (1) the tax classification is reasonable, not arbitrary; and (2) the statute applies equally to all who fall within the same classification. *GBN*, 249 Mont. at 266, 815 P.2d at 597. Further, a classification is reasonable if any reasonably conceivable state of facts provides a rational basis for it. *Montana Stockgrowers*, 238 Mont. at 119, 777 P.2d at 290. A classification is not reasonable if it "confers particular privileges or imposes peculiar disabilities upon [a] class of persons arbitrarily selected from a larger number of persons, all of whom stand in the same relation to privileges conferred or disabilities imposed." *Leuthold v. Brandjord* (1935), 100 Mont. 96, 105, 47 P.2d 41, 45.

¶56 We have previously considered many types of tax classifications under the equal protection clause. Further, we have upheld tax provisions that separate out a sub-class for different treatment. For example, in *Montana Stockgrowers,* we considered a provision that separated livestock, which was taxed at four percent, from general business inventory which was exempt from taxation. We held the distinction had a rational basis because breeding stock were not held for sale, because local governments relied on livestock property to raise revenue, and because historically the Legislature distinguished between livestock and merchandising stock. *Montana Stockgrowers*, 238 Mont. at 119-20, 777 P.2d at 288-89. *See also Hardin Auto Co. v. Alley* (1967), 149 Mont. 1, 4-5, 422 P.2d 346, 347-48 (equal protection does not prevent separating out inventory at car dealerships as a class

for tax purposes from other types of retail inventory); *Geil v. Missoula Irrigation Dist.*, 2002 MT 269, ¶¶ 48-49, 312 Mont. 320, ¶¶ 48-49, 59 P.3d 398, ¶¶ 48-49.

¶57 In this case, the District Court found based on the undisputed facts that vo-techs are generally attended by older, non-traditional students who are local residents. The court also stated:

> The legislature thus could determine reasonably that the College of Technology, in contrast to traditional four-year state universities whose geographical attraction is broad and whose programs are not focused generally on particular occupations, generates educational opportunities of unique value for local residents through courses directed at developing or enhancing specific workplace skills to be used within the immediate community.

Accordingly, the court held that the attendance by local residents and the course offerings served as a rational basis for putting the counties with vo-techs in a separate class for purposes of the vo-tech levy.

¶58 ■■■ We agree. Like the tax at issue in *Montana Stockgrowers*, the vo-tech levy is rational because the vo-techs have historically relied on it to raise revenue and because the vo-techs are distinguishable from other parts of the university system. Further, the fact that local residents tend to attend the vo-techs in order to receive a broad cross-section of workforce related courses serves as a "reasonably conceivable state of facts" that provides a rational basis for the vo-tech levy. Therefore, the counties with vo-techs are not arbitrarily selected from the rest of the state because vo-tech counties do not stand in the same relation to the greater privileges conferred on those counties by vo-techs than the rest of the state. Accordingly, the disability of the vo-tech levy is rationally imposed.

¶59 ■■■ Simply because other state taxes for education funding are assessed in every county does not mean that the Legislature is prohibited from creating sub-classes for tax purposes. Further, the tax at issue in *Woodahl* is distinguishable because unlike the vo-techs, funding for elementary and secondary education must be raised in accordance with Article X, Section 1(3). *Woodahl*, 164 Mont. at 151, 520 P.2d at 781. Therefore, we hold that the vo-tech levy is rationally related to the legitimate government interest of providing partial funding for the vo-techs.

¶60 The Taxpayers assert that *Allegheny Pittsburgh Coal Co. v. County Com'n* (1989), 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688, governs the analysis here. However, that case is also distinguishable because it did not involve a tax classification. Rather, the county

assessor in that case was using two different methods to value adjoining property that was in the same class. Therefore, the Supreme Court found the tax resulting from the different assessment methods violated equal protection. What the Taxpayers fail to accept here is that the five counties are in a different class and that class is rationally related to the purpose of providing funding for vo-techs.

¶61 The Taxpayers also assert that *Roosevelt* is binding. Again, we disagree. In that case, we considered the constitutionality of a system for phasing in changes to the assessed value of property for tax purposes under Article VIII, Section 3. *Roosevelt*, ¶ 7. We held that the phase-in was unconstitutional because it resulted in a system with problems like that in *Allegheny*. Like property was given different valuations–some below, some at, and some above market value–for no rational reason. *Roosevelt*, ¶¶ 34-45. Our holding involved a state-wide system for the equalization of property values, not a classification of property.

¶62 Similarly, in *Barron*, 245 Mont. 100, 799 P.2d 533, and *Sheehy*, 262 Mont. 104, 862 P.2d 1181, we struck down appraisal systems that resulted in marked differences in the value of like property under Article VIII, Section 3. Again, the initial classification of property was not at issue in either of those cases. Rather, in all three of the above cases, the inequitable valuation systems we struck down *resulted in* arbitrary classes because like property was valued differently.

¶63 The Taxpayers also cite cases from other jurisdictions in support of their argument. However, these cases are also distinguishable because they involve arbitrary classifications. *See e.g. MCI Telecommunications Corp. v. Limbach* (Ohio 1994), 625 N.E.2d 597 (MCI property taxed at a different rate than other similar companies held violation of equal protection); *Edward Valves, Inc. v. Wake County* (N.C. Ct. App. 1995), 451 S.E.2d 641 (intangible personal property that is sold improperly taxed differently than intangible personal property not sold); *Nolichuckey Sand Co. v. Huddleston* (Tenn. Ct. App. 1994), 896 S.W.2d 782 (equal protection violation by population brackets distinguishing counties that had no rational basis).

¶64 In making their arguments, the Taxpayers assert that a tax on any county with a university system institution would not be arbitrary. If the Legislature can make a classification that separates out any county with a university system component from counties without, why not the current sub-classification separating out vo-techs?

¶65 The Taxpayers also argue that the stipulated facts do not support the District Court's decision. The Taxpayers assert that the State's data regarding whether a student is local or not is not complete, not

accurate, and makes an apples and oranges comparison between the resident addresses of Montana State University students and vo-tech students. However, the Taxpayers fail to accept that the rational basis test allows for "any reasonably conceivable state of facts." The student residence data does not have to meet scientific standards for comparison. Rather, we must decide, as we have, whether it is reasonably conceivable that more local residents attend vo-techs. We hold that it is.

¶66 Finally, the Taxpayers refute the State's argument that the vo-tech levy is rationally related to the legitimate objective of financially supporting the vo-techs by asserting that taxes cannot be based on the benefit received. The Taxpayers assert that such rationale only applies to fees and assessments. In noting that there is no longer local control over the vo-techs, the Taxpayers assert that funding for local projects is only allowed when there is local authority over the projects. We agree that the vo-techs are not locally controlled. However, we disagree that state-level control of vo-techs bars the state from creating a tax classification under the equal protection clause that has a rational basis.

## V. CONCLUSION

¶67 ▮▮▮ Because the District Court was correct in holding that the vo-tech levy as mandated by § 20-25-439(1), MCA, does not violate Montana's Constitution, we affirm.

CHIEF JUSTICE GRAY, JUSTICES COTTER, TRIEWEILER and LEAPHART concur.