
DA 10-0427

## IN THE SUPREME COURT OF THE STATE OF MONTANA

### 2011 MT 162

HAROLD CALDWELL,

      Plaintiff and Appellee,

  v.

MACO WORKERS' COMPENSATION TRUST,

      Respondent and Appellant.

APPEAL FROM:    Workers' Compensation Court
                     Honorable James Jeremiah Shea, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Norman H. Grosfield (argued), Grosfield Law Firm, Helena, Montana

      For Appellee:

          Rexford L. Palmer (argued), Attorneys Inc., P.C., Missoula, Montana

      For Amicus Curiae:

          Bradley J. Luck (argued), Garlington, Lohn & Robinson, PLLP, Missoula, Montana

                                         Argued:    April 15, 2011
                                         Submitted: April 26, 2011
                                         Decided:   July 11, 2011

Filed:

                        _____
                                 Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 MACo Workers' Compensation Trust (MACo) appeals from a determination of the Workers' Compensation Court (WCC) that § 39-71-710, MCA, violates the Equal Protection Clause found in Article II, Section 4, of the Montana Constitution. We affirm.

¶2 We review the following issue on appeal:

¶3 *Does the categorical denial of rehabilitation benefits to a workers' compensation claimant violate equal protection when the basis for denial turns solely on the claimant's age-based eligibility for social security benefits?*

FACTUAL AND PROCEDURAL BACKGROUND

¶4 Harold Caldwell (Caldwell) worked as the Ravalli County airport manager. On November 25, 2005, he slipped on an icy airport taxiway, fell, and suffered traumatic head injuries. Caldwell was 77 years old at the time of his accident. The airport's insurer, MACo, accepted Caldwell's claim and paid his medical and wage-loss benefits.

¶5 Caldwell has worked for 57 years of his life. He stopped working only due to his debilitating injury. Caldwell served in the U.S. Army for 25 years and retired with a full military pension at age 44. Caldwell worked in livestock ranching, resort management, and mining between the ages of 44 and 62. Caldwell began drawing social security retirement benefits at age 62. Caldwell continued working as a mining supervisor until age 74, when he began full-time employment as the Ravalli County airport manager. He earned more than $25,000 per year as the manager.

2

¶6 Caldwell reached medical stability from his head injuries on February 11, 2008. He asked MACo at that point to initiate rehabilitation services under § 39-71-1006, MCA. Caldwell sought to gain training that would enable him to re-enter the workforce. MACo denied Caldwell rehabilitation benefits based on § 39-71-710, MCA.

¶7 Caldwell challenged the constitutionality of § 39-71-710, MCA, on the basis that the statute's categorical termination of benefits based on a claimant's eligibility for social security violated equal protection principles. The WCC agreed. The WCC concluded that § 39-71-710, MCA, created two similarly situated classes and treated them disparately without being reasonably related to a legitimate government interest. MACo appeals the WCC's determination.

STANDARD OF REVIEW

¶8 We review for correctness the WCC's conclusion of law that involves a constitutional issue. *Henry v. St. Compen. Ins. Fund,* 1999 MT 126, ¶ 10, 294 Mont. 449, 982 P.2d 456.

DISCUSSION

¶9 *Does the categorical denial of rehabilitation benefits to a workers' compensation claimant violate equal protection when the basis for denial turns solely on the claimant's age-based eligibility for social security benefits?*

¶10 Section 39-71-710, MCA, deems "retired" any disabled worker eligible for social security retirement benefits. The statute eliminates permanent partial disability benefits, permanent total disability benefits, and rehabilitation benefits for those disabled workers deemed "retired" by operation of the statute. Section 39-71-710, MCA. Injured workers

3

have challenged the constitutionality of § 39-71-710, MCA, twice in the last seven years. *Reesor v. Mont. St. Fund,* 2004 MT 370, 325 Mont. 1, 103 P.3d 1019; *Satterlee v. Lumberman's Mut. Cas. Co.,* 2009 MT 368, 353 Mont. 265, 222 P.3d 566.

¶11 This Court held in *Reesor* that § 39-71-710, MCA, violated equal protection as to claimants who had been denied permanent partial disability benefits based solely on their eligibility for social security benefits. *Id.* at ¶ 25. This Court held in *Satterlee*, in contrast, that the categorical elimination of permanent total disability benefits passed constitutional review based on the possibility that permanent total disability benefits could transform into a lifetime benefit. *Id.* at ¶ 28. Caldwell and MACo now present the Court with an equal protection challenge as to the third kind of benefit—rehabilitation benefits—categorically eliminated by § 39-71-710, MCA.

¶12 A worker injured on the job may recover rehabilitation benefits designed to return the disabled worker to work. Sections 39-71-1006, -1011(4), MCA. The statute limits to 104 weeks a disabled worker's right to receive rehabilitation benefits at the worker's temporary total disability rate. Section 39-71-1006(2), MCA. A disabled worker can receive additional costs for tuition, fees, books, and other retraining expenses. Section 39-71-1006(3), MCA.

¶13 A disabled worker must see a rehabilitation provider and establish a rehabilitation plan in order to determine the worker's eligibility for rehabilitation benefits and in order to determine the extent of benefits available. Section 39-71-1006(1)(b)-(c), MCA. The disabled worker's rehabilitation plan must consider the worker's "age, education, training, work history, residual physical capacities, and vocational interests." Section 39-71-

4

1006(1)(c), MCA. A disabled worker who seeks rehabilitation benefits must have a rehabilitation provider certify that the disabled worker has "reasonable vocational goals and reasonable reemployment opportunity." Section 39-71-1006(1)(b), MCA. Caldwell would have been entitled to seek rehabilitation benefits subject to the qualifications in § 39-71-1006, MCA, similar to any younger worker disabled on the job, but for the categorical elimination of rehabilitation benefits for older workers in § 39-71-710, MCA.

¶14 Article II, Section 4 of the Montana Constitution provides that "[t]he dignity of the human being is inviolable. No person shall be denied the equal protection of the laws." Equal protection provides a check on governmental action that treats similarly situated persons in an unlike manner. *Oberson v. U.S. Dept. of Agric.*, 2007 MT 293, ¶¶ 18-19, 339 Mont. 519, 171 P.3d 715; *Reesor,* ¶ 15. We follow a three-step process to analyze an equal protection claim. *Satterlee,* ¶ 15.

¶15 *1. Whether the challenged statute creates similarly situated classes.*

¶16 We first consider whether the governmental action creates classes of similarly situated persons and treats them in an unequal manner. *Id.* The parties concede, and we agree, that § 39-71-710, MCA, creates two similarly situated classes and treats them differently. As the WCC concluded, the classes consist of (1) those vocational rehabilitation eligible claimants who are eligible to receive social security retirement benefits, and (2) those who are not eligible. *See Reesor,* ¶¶ 10, 12; *Satterlee,* ¶ 15.

¶17 Amicus Montana State Fund (MSF) argues that § 39-71-710, MCA, does not create two similarly situated classes. MSF agrees that the statute creates two classes, but argues

that those classes consist of persons "in" the workforce and persons "out" of the workforce. MSF argues that those "in" the workforce cannot be situated similarly to those "out" of the workforce. MSF's argument misses the mark.

¶18 Caldwell challenges § 39-71-710, MCA, precisely because it deems him "out" of the workforce based solely on his age-defined eligibility for social security benefits. We reject here, as we did in *Reesor* and *Satterlee,* amicus MSF's argument that § 39-71-710, MCA, does not create similarly situated classes. *Reesor,* ¶¶ 11-12; *Satterlee,* ¶ 16. Section 39-71-710, MCA, creates two classes out of similarly situated claimants who have suffered work-related injuries, could not return to their former jobs, had permanent physical impairment ratings, and must rely on the Workers' Compensation Act as their exclusive remedy. *Reesor,* ¶ 12; *Satterlee,* ¶ 16. Caldwell and MACo correctly assess that § 39-71-710, MCA, creates two classes out of similarly situated persons, distinguished only by the age-based deemed "retired" provision of § 39-71-710, MCA.

¶19 We do not operate on a blank slate regarding the appropriate classification for our equal protection analysis. *Oberson,* ¶ 19. We begin by considering "the statute's purpose in order to determine the threshold question of whether the statute created a discriminatory classification -- i.e. a classification that treats two or more similarly situated groups in an unequal manner." *Oberson,* ¶ 19. As we concluded in *Reesor* and *Satterlee,* age represents "the only identifiable distinguishing factor between the two classes" created by § 39-71-710, MCA. *Reesor,* ¶ 12; *Satterlee,* ¶ 16. "Furthermore," as this Court stated in *Reesor,*

6

"chronological age and the corresponding eligibility for social security retirement benefits is unrelated to a person's ability to engage in meaningful employment." *Reesor,* ¶ 12.

¶20   *2. The appropriate level of constitutional scrutiny.*

¶21   We next determine the level of scrutiny to apply to the challenged legislation. *Reesor,* ¶ 13. The parties have not asked the Court to apply a stricter standard of review than rational basis. The parties dispute only the third step of the equal protection analysis which considers whether the challenged governmental action passes constitutional scrutiny, in this case, rational basis review.

¶22   *3. Evaluating this constitutional challenge under rational basis.*

¶23   Rational basis requires that § 39-71-710, MCA, bear a rational relationship to a legitimate governmental interest. *Satterlee,* ¶ 18. We recently have considered the governmental interests underlying § 39-71-710, MCA, in *Reesor* and *Satterlee. Reesor,* ¶¶ 17-24; *Satterlee,* ¶¶ 25-30.

¶24   The claimant in *Reesor* had turned age 65 and had begun receiving social security retirement benefits about eight months before his work-related injury. *Id.* at ¶ 3. The claimant, Dale Reesor, received temporary total disability benefits and an impairment award from his employer's insurer, MSF. *Id.* at ¶ 4. MSF denied the claimant permanent partial disability benefits, however, based on the categorical elimination of such benefits in § 39-71-710, MCA. *Id.* at ¶ 5.

¶25   A permanent partial disability exists if a worker has a permanent impairment of the worker's ability to work that causes actual wage loss, but does not preclude the worker from

7

returning to work in some capacity. Section 39-71-116(24), MCA. Montana law limits permanent partial disability benefits to a period of 375 weeks and to a percentage of the worker's lost wages. Section 39-71-703, MCA. Reesor challenged the fact that the statute allows the award of permanent partial disability benefits to younger workers, but denies them to older workers deemed "retired" based on social security eligibility. Reesor claimed that this disparate treatment violated his right to equal protection. *Id.* at ¶ 8. The Court agreed and concluded that no rational basis existed to award permanent partial disability benefits to a 45-year-old injured worker, but to deny those same benefits to a 65-year-old worker with an identical injury. *Id.* at ¶ 23.

¶26 The Court stated broadly that "no rational basis" existed "to deny a class of injured workers a category of benefits based upon their age." *Reesor,* ¶ 23. The Court departed from this broad statement in *Satterlee*. The Court concluded in *Satterlee* that the categorical age-based elimination of permanent total disability benefits in § 39-71-710, MCA, rationally related to the legitimate governmental interest of providing wage-loss benefits that bear a reasonable relationship to actual wages lost. *Satterlee,* ¶ 28.

¶27 The claimants in *Satterlee* had suffered work-related injuries for which they received permanent total disability benefits. *Satterlee,* ¶ 5. An injured worker has a permanent total disability if the worker's injury has foreclosed the worker's reasonable prospect of physically performing regular employment. Section 39-71-116(25), MCA. A worker with a permanent total disability must be paid permanent total disability benefits for the duration of the worker's permanent total disability. Section 39-71-702(1), MCA. The *Satterlee* claimants'

8

award of benefits terminated upon becoming eligible for social security benefits pursuant to § 39-71-710, MCA. *Id.* at ¶ 5. The claimants challenged the categorical elimination of permanent total disability benefits on equal protection grounds. *Id.* at ¶ 6. The Court concluded that "it is rational for the workers' compensation system to terminate [permanent total disability] benefits at a time when, statistically, most people's work-lives have ended." *Id.* at ¶ 28.

¶28 *Reesor* concluded that the categorical elimination in § 39-71-710, MCA, violated equal protection, while *Satterlee* concluded that it survived constitutional review. *Satterlee* did not overrule *Reesor* or signify some new path upon which this Court would embark in our equal protection jurisprudence. The Court's dispositions instead turned on the differences between the purposes and entitlement schemes of the varying kinds of benefits. *Satterlee,* ¶ 27. The Court determined that "PPD benefits and PTD benefits serve very different purposes and employ very different entitlement schemes." *Id.* The Court further explained that the "difference between the timeframes over which PPD and PTD benefits are meant to serve" constituted the critical distinction for purposes of the equal protection analysis. *Id*.

¶29 The Court in *Satterlee* did not even "equate *Reesor* with the case at bar." *Id.* The Court concluded that each class of benefits was "simply too different and serve[s] such divergent purposes that equating" them would be inappropriate. *Id.* at ¶ 24. Permanent partial disability benefits serve the purpose of restoring a claimant to a pre-accident wage level by providing wage-loss benefits, but only for 375 weeks. *Satterlee,* ¶ 23; § 39-71-703,

9

MCA. Permanent total disability benefits serve to assist a disabled worker who cannot ever return to work for the duration of his or her injury. *Satterlee,* ¶ 23; § 39-71-702, MCA. The court focused on the fact that permanent total disability benefits did not "terminate after a limited number of weeks," but assisted "the worker over the course of his or her work life." *Satterlee,* ¶ 27. As a result, the Court determined that the age-based categorical elimination in § 39-71-710, MCA, constituted a "sufficiently rational means of ensuring that PTD benefits [did] not become a lifetime benefit." *Satterlee,* ¶¶ 27-28. The Court recognized the legitimate governmental interest in not allowing permanent total disability benefits to "run on until the claimant's death." *Id.* at ¶ 28.

¶30    Montana law limits a worker's eligibility for rehabilitation benefits, like the limitation for permanent partial disability benefits, to a set number of weeks. Section 39-71-1006, MCA. A disabled worker can receive rehabilitation benefits for a maximum of 104 weeks. *Id.* No risk exists that rehabilitation benefits could "run on until the claimant's death" or transform into a "lifetime benefit." *Satterlee,* ¶ 28.

¶31    In addition to considering the entitlement scheme of rehabilitation benefits, we must consider the purposes served by rehabilitation benefits. *Satterlee,* ¶ 27. We already have concluded that § 39-71-105(3), MCA, provides the policy statement for the state's interest underlying rehabilitation benefits. *Henry,* ¶ 39. Section 39-71-105(3), MCA, sets forth the policy of the workers' compensation system "to return a worker to work as soon as possible." The statute recognizes that a work-related injury "has a negative impact on the worker, the worker's family, the employer, and the general public." Section 39-71-105(3),

10

MCA. Rehabilitation benefits advance this stated policy by setting the worker on a rehabilitation plan that assists the worker "in acquiring skills or aptitudes to return to work" and "reasonably reduce[] the worker's actual wage loss." Section 39-71-1011(4), MCA.

¶32 Critical differences exist among the entitlement schemes and purposes underlying rehabilitation benefits, permanent partial disability benefits, and permanent total disability benefits. These differences guide our analysis as to whether the categorical elimination of rehabilitation benefits in § 39-71-710, MCA, violates equal protection. We turn to consider the governmental interests underlying § 39-71-710, MCA, and whether the categorical elimination of rehabilitation benefits for older workers rationally relates to those interests.

¶33 *a. Legitimate governmental interests served by § 39-71-710, MCA.*

¶34 Cost containment of the workers' compensation system presents a legitimate governmental interest. *Satterlee,* ¶ 29. The legislature often pursues its interest in controlling the costs of the workers' compensation system. *Id.* These pursuits lie within constitutional authority so long as the legislature's attempts to improve the viability of the workers' compensation system follow rational means and so long as "cost containment is not the sole reason for disparate treatment." *Id.* If the Court permitted otherwise, "cost containment" alone could justify nearly every legislative enactment without regard for the guarantee for equal protection of the law. *Henry,* ¶ 40 (citing *Heisler v. Hines Motor Co.,* 282 Mont. 270, 283, 937 P.2d 45, 52 (1997)).

¶35 The Court in *Henry* recognized that cost-control alone cannot justify disparate treatment that "violates an individual's right to equal protection of the law." *Id.* Not

surprisingly, discrimination in the form of "offering services to some while excluding others for any arbitrary reason, will *always* result in lower costs." *Id*. We must scrutinize attempts to disguise violations of equal protection as legislative attempts to "contain the costs" or "improve the viability" of the worker's compensation system. Cost alone does not justify the disparate treatment of similar classes. *Satterlee,* ¶ 29.

¶36 The WCC concluded that § 39-71-105(3), MCA, sets forth the public policy for rehabilitation benefits and that terminating rehabilitation benefits "[flew] in the face of this stated legislative objective." MACo faults the WCC for focusing solely on the policy statement in § 39-71-105(3), MCA. We agree insofar as § 39-71-105(3), MCA, provides the policy statement for providing rehabilitation benefits, as opposed to the policy statement for the elimination of rehabilitation benefits in § 39-71-710, MCA. Caldwell has challenged the constitutionality of § 39-71-710, MCA. The WCC correctly looked to the policy statement in § 39-71-105(3), MCA, however, to consider whether the categorical elimination in § 39-71-710, MCA, rationally relates to the governmental interests served by rehabilitation benefits.

¶37 MACo and amicus MSF argue that several additional legitimate governmental interests, independent of the interest in cost-containment, support the categorical elimination. MACo argues that the legislature has a legitimate interest in (1) creating a wage replacement system, (2) assisting the worker at a reasonable cost to the employer, (3) controlling the costs of the workers' compensation program in order to continue providing benefits, and (4) avoiding duplication or overlapping of benefits. Amicus MSF adds that the legislature has a

12

legitimate interest in (5) providing wage-loss benefits that bear a reasonable relationship to actual wages lost, (6) creating reasonably constant rates for employers, and (7) tailoring benefit entitlement to need. We address these purported interests in turn.

¶38 First we conclude that the governmental interest in creating a wage replacement system bears little relevance in the context of rehabilitation benefits. Section 39-71-105(1), MCA, sets forth the governmental interest in creating a wage replacement system. *Reesor*, ¶ 18. A related legitimate governmental interest exists in providing wage-loss benefits that bear a reasonable relationship to actual lost wages. *Satterlee,* ¶¶ 30-31. Rehabilitation benefits do not replace lost wages, however, and should be distinguished from the wage replacement system at issue in *Reesor* and *Satterlee.* A disabled worker like Caldwell could receive temporary total disability, permanent total disability, permanent partial disability, or temporary partial disability benefits to replace his or her lost wages. Sections 39-71-701 to -703, -712, MCA. In contrast, rehabilitation benefits, like medical benefits, disfigurement benefits, or funeral benefits, do not replace lost wages. Sections 39-71-704, -708, -725, MCA. The elimination of rehabilitation benefits cannot be understood as serving, or even relating to, the governmental interest in creating a wage-replacement system that bears a reasonable relationship to actual wages lost. We finally note that MACo accepted and paid Caldwell's medical and wage-loss benefits.

¶39 We similarly reject the notion that the governmental interest in providing reasonably constant rates to employers will be served by the categorical elimination of rehabilitation benefits. Section 39-71-105(4), MCA, contains the policy statement about "reasonably

13

constant rates." That policy statement relates to the interest in creating a "primarily self-administering" workers' compensation system that "minimize[s] reliance upon lawyers and the courts." Section 39-71-105(4), MCA. We specifically reject the suggestion that the categorical elimination of rehabilitation benefits serves to provide reasonably constant rates. Eliminating rehabilitation benefits for older workers might constantly lower rates, but that interest simply duplicates the cost-containment interest already discussed.

¶40 We also have recognized that "assisting the worker at a reasonable cost to the employer" presents a legitimate governmental interest in equal protection claims. *Satterlee,* ¶ 30. We disagree that eliminating rehabilitation benefits relates to assisting the worker at a reasonable cost to the employer. We particularly reject the argument that "reasonable cost to the employer" always means "lower cost to the employer." Such an argument does not constitute a legitimate governmental interest separate from the cost-containment interest.

¶41 MACo argues that avoiding the duplication or overlapping of benefits serves as a reasonable and permissive legislative objective. MACo argues that it would be irrational to allow claimants to receive both social security and rehabilitation benefits. We rejected this argument in *Reesor* when we pointed out that no coordination of benefits exists between the Workers' Compensation Act and the social security system. *Reesor,* ¶¶ 20-24. Caldwell's social security benefits will not provide him with resources to receive rehabilitation benefits that will return him to work after being disabled on the job as an employee for the Ravalli County airport. The Dissent elevates generalized statements of the law from *Larson's Workers' Compensation Law* and the Kentucky Supreme Court above decisions of this

Court. *Dissent,* ¶ 68. We addressed the same "duplication of benefits" argument in *Reesor.*

*Reesor,* ¶¶ 20-24. We explained that "social security retirement benefits are not wage loss

benefits" and do not offset one another. *Id.* at ¶ 24.

¶42 The Dissent makes no attempt to explain how the categorical elimination of

rehabilitation benefits "minimize[s] overlap" of the income a person might receive from

social security. The Dissent fails to show how a person's social security income "offset[s]"

the categorical denial of rehabilitation benefits for older workers. Moreover, the Dissent

makes no effort to explain why rehabilitation benefits should be treated like the permanent

total disability benefit in *Satterlee* rather than the permanent partial disability benefit in

*Reesor.*

¶43 MACo cites *Stratemeyer v. Lincoln Co.,* 259 Mont. 147, 154, 855 P.2d 506, 511

(1993), for the argument that a legitimate governmental interest exists to control costs *in

order to* continue providing benefits. MACo's argument misrepresents the actual statements

in *Stratemeyer* that identified "controlling the costs of the program and providing benefits"

as a legitimate governmental interest. We know of no authority to support the argument that

the legislature can eliminate benefits from one class of people *in order to* continue providing

benefits to another class of similarly situated people.

¶44 We likewise reject amicus MSF's "tailoring benefit entitlement to need" argument.

MSF cites no authority for its tailoring argument, except two paragraphs out of *Satterlee.*

Those paragraphs do not recognize a "tailoring" interest or any additional legitimate

governmental interest not already discussed. We reject the suggestion that the legislature

15

constitutionally can eliminate rehabilitation benefits for older workers so as to "tailor" or provide benefits to those in "need," which presumably means younger workers.

¶45 Immediately beneath the surface of MACo's and MSF's "best allocation" and "tailoring" arguments lurks the belief that society should not rehabilitate older people because the return on the investment may not be as high. This bias also permeates the Dissent's reasoning that the legislature may "allocate resources toward those who, statistically speaking, will use them," *Dissent,* ¶ 67, and that "the legislature may reasonably determine that retraining is most important for those workers with a long work life ahead of them and may channel resources toward that group of workers." *Dissent,* ¶ 71.

¶46 The Dissent's approach would permit the legislature to provide benefits unequally to similarly situated persons so long as "empirical evidence" or statistics supported the legislature's decision. We reject the notion that the legislature acts rationally when it categorically withholds benefits from a similarly situated minority group because, "statistically speaking," most people's work life ends upon eligibility for social security. *Dissent,* ¶ 65. The statistical majority holds no monopoly on equal protection guarantees.

¶47 The Dissent's reasoning begs the question of whether the constitutional right to equal protection hinges on the most recent labor statistics of the working elderly or on Congress's decision to raise the age eligibility of the social security system. Our equal protection analysis does not allow the legislature to violate the equal protection rights of those persons who, statistically speaking, represent the minority of persons who must continue working at

ages beyond eligibility for social security because they could not otherwise provide for themselves or their families.

¶48     MACo and MSF have argued that several legitimate governmental interests exist in addition to the legitimate governmental interest in cost-containment of the workers' compensation system. The other interests they have offered either (1) duplicate the cost-containment interest or (2) bear no relation to the elimination of rehabilitation benefits in § 39-71-710, MCA. "Cost alone is insufficient to justify the disparate treatment of similar classes." *Satterlee,* ¶ 29. The categorical elimination of rehabilitation benefits in § 39-71-710, MCA, serves no legitimate governmental interest, other than cost-containment, and therefore violates equal protection.

¶49     *b.  Whether § 39-71-710, MCA, rationally relates to any legitimate governmental interest.*

¶50     The WCC concluded that the automatic termination of rehabilitation benefits in § 39-71-710, MCA, did not rationally relate to any legitimate governmental interest. We agree that categorical elimination of rehabilitation benefits in § 39-71-710, MCA, based solely on age-defined eligibility for social security, does not rationally relate to any legitimate governmental interest. *Reesor,* ¶¶ 19, 23. Eligibility for social security benefits bears no rational relationship to a worker's ability or willingness to return to work. *Id.* at ¶ 12. Social security eligibility turns solely on a person's age and whether he or she has accrued enough social security earnings. 20 C.F.R. § 404.310 (2011).

17

¶51    Caldwell's work history demonstrates the irrationality of categorically eliminating rehabilitation benefits once a person becomes eligible for social security. Caldwell served the workforce for 15 years *after* becoming eligible to draw social security benefits and for 33 years *after* "retirement" from the U.S. Army. Caldwell's entitlement to rehabilitation benefits will be limited by consideration of his age, residual physical capacities, and vocational interests. Section 39-71-1006(1)(c), MCA. A rational basis does not support the categorical elimination of rehabilitation benefits in § 39-71-710, MCA. Section 39-71-710, MCA, violates the Equal Protection Clause of the Montana Constitution insofar as it deems disabled workers ineligible to receive rehabilitation benefits based on their eligibility for social security benefits.

¶52    We affirm the judgment of the WCC.


/S/ BRIAN MORRIS


We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ JAMES C. NELSON

18

Justice Patricia O. Cotter concurs.

¶53    I concur in the Court's Opinion.  I write separately to dispel the notion inherent in the cost containment arguments of MACo and amicus MSF that giving older workers the opportunity to receive rehabilitation benefits will lead to an explosion of costs.  This concern is largely unwarranted, as the Workers' Compensation Act has in place a cost containment measure that will account for the age and capacity of the injured worker in determining whether and to what extent such benefits will be available.

¶54    As the Court points out at ¶ 13, a worker is not eligible for rehabilitation benefits unless he or she meets the definition of a disabled worker, and a rehabilitation provider designated by the insurer has certified that the worker has reasonable vocational goals and reasonable reemployment opportunity.  Sections 39-71-1006(1)(a)–(b), MCA.  A rehabilitation plan must be prepared and agreed to by the parties.  It must take account of the worker's age, education, training, work history, residual physical capacities, and vocational interests.  Section 39-71-1006(1)(c), MCA.  This system is designed to and does limit the number of persons eligible for rehabilitation benefits and the amount of benefits available.  Presumably, the system will continue to function the same way once older workers become eligible for benefits; indeed, there is a likelihood that it will screen a large number of older applicants out of the system if the rehabilitation provider concludes that the older worker—

19

for any or all of the reasons noted above—does not have reasonable reemployment opportunities.

¶55    Caldwell and other older workers will not be guaranteed rehabilitation benefits by virtue of our decision; they will simply be guaranteed the same right to seek such benefits as is enjoyed by a younger worker disabled on the job.  This is the essence of equal protection. I therefore concur with the Court's decision.


                                    /S/ PATRICIA COTTER


Justice James C. Nelson joins in the Concurrence of Justice Patricia O. Cotter.


                                    /S/ JAMES C. NELSON


Justice James C. Nelson, concurring.

¶56    I concur with the Court's decision.  While the Opinion correctly discusses *Satterlee v. Lumberman's Mut. Cas. Co.*, 2009 MT 368, 353 Mont. 265, 222 P.3d 566, as the present state of the law, I continue to disagree with our decision in that case.  *See Satterlee*, ¶¶ 42-56 (Morris & Nelson, JJ., dissenting).  If nothing else, the Court's Opinion here points up the unfairness, fallibility, and illogic of "statistical" retirement ages.  *See* Opinion, ¶¶ 42, 45-47.

¶57    In point of fact, workers are living longer, and, of necessity, many have to work past their "statistical" retirement ages in order to provide the basic necessities of life for

themselves and their families. Neither wages nor Social Security has even remotely kept pace with inflation and the rising prices of basic consumer goods, food, and healthcare. Grandparents are raising their grandchildren and may have their own out-of-work children living with them. Defined benefit pension plans are a thing of the past outside government employment, and any notion that ordinary working people can save enough to actually retire without working is a fiction.

¶58     Indeed, given the graying of America, our country's declining birth rates, and an economy that just never seems to "trickle down" to ordinary working people,[1] it is completely illogical and without rational basis to deny an injured worker compensation or benefits on the basis of the person's "statistical" retirement age. If the Legislature is sold on statistics, I suggest it is using the wrong ones.

¶59     As support for its argument, the Dissent cites cases in which we have said that a classification is reasonable if "any reasonably conceivable state of facts" provides a rational basis for it, *Kottel v. State*, 2002 MT 278, ¶ 55, 312 Mont. 387, 60 P.3d 403, and that the purpose of the challenged legislation may be "any possible purpose of which the court can conceive," *Satterlee*, ¶ 34 (internal quotation marks omitted). Admittedly these standards have been in our caselaw for some time now. *See e.g. Johnson v. Sullivan*, 174 Mont. 491, 498-99, 571 P.2d 798, 802 (1977); *Stratemeyer v. Lincoln County*, 259 Mont. 147, 152, 855 P.2d 506, 509-10 (1993). Nevertheless, upon reflection, I cannot agree with the proposition that rational-basis review involves our imagining possible reasons or purposes for an

21

enactment. For one thing, why should *we* be searching for reasons and purposes to support the challenged legislation? That is not only arbitrary on our part, but also intrudes upon the Legislature's duty to craft constitutional laws. Furthermore, this approach does not fulfill rational-basis scrutiny. "Rational" means based on correct and valid reasoning and logic. *The American Heritage Dictionary of the English Language* 1029, 1452 (4th ed., Houghton Mifflin 2000). The legislative classification, in other words, must bear a logical and reasoned relationship to a specific and legitimate purpose. Simply because we might conceive of some purpose that the legislation could theoretically serve under some hypothetical set of facts in no way establishes that the legislation is rationally related to the particular purpose for which it was enacted. In my view, the "any conceivable purpose/reason" approach is flawed and should be rejected.

¶60    Finally, the Dissent also argues that public policy determinations are the domain of the Legislature and that this Court must give deference to the Legislature's policy choices. Our deference, however, is not boundless when legislation is challenged as violative of the Constitution. Deference does not mean abdication, and "rational-basis scrutiny" is still scrutiny. It is, in point of fact, this Court's obligation here to review the Legislature's specific implementation of its policy choices and determine whether the legislation at issue bears a rational relationship to a legitimate governmental interest. It does not bear that relationship, for the reasons stated in the Court's Opinion.

¶61    I accordingly concur in our decision.

---

[1] Although, the benefits and rewards of the economy always seem to percolate up.

22

Justice Beth Baker, dissenting.

¶62 As we often have observed, every objective in favor of the constitutionality of a state statute must be presumed. In reviewing the constitutionality of state laws, the question is "not whether it is possible to condemn, but whether it is possible to uphold the legislative action[.]" *Satterlee*, ¶ 10 (quoting *Powell v. State Compen. Ins. Fund,* 2000 MT 321, ¶ 13, 302 Mont. 518, 15 P.3d 877). These principles must be honored by the courts even in cases where we may think the legislature could have devised a better system to fulfill its purposes. Particularly when considering an equal protection challenge to legislative enactments of economic and social regulations, courts must give deference to the legislature's policy choices unless their infirmity is proven beyond a reasonable doubt. If there is "any reasonably conceivable state of facts" to support a legislative classification, its decision is entitled to respect. *Kottel v. State*, 2002 MT 278, ¶ 55, 312 Mont. 387, 60 P.3d 403. The Court's review is not confined to those purposes espoused by the legislature, litigants, or the district court, but extends to "any possible purpose of which the court can conceive." *Satterlee*, ¶ 34. This standard reflects the courts' awareness "that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 314, 96 S. Ct. 2562, 2567 (1976) (per curiam). "The

23

legislature is simply in a better position to develop the direction of economic regulation, social and health issues." *Stratemeyer*, 259 Mont. at 153, 855 P.2d at 510.

¶63     We look frequently to the federal courts for guidance in applying the constitution's guarantee of equal protection of the law. *See e.g. Powder River County v. State,* 2002 MT 259, ¶ 79, 312 Mont. 198, 60 P.3d 357; *Stratemeyer*, 259 Mont. at 152, 855 P.2d at 509; *Butte Community Union v. Lewis*, 219 Mont. 426, 431, 712 P.2d 1309, 1312 (1986). Age-based distinctions long have been upheld against equal protection challenges where the age classification is rationally related to a legitimate state interest, despite imperfection in the state's determinations or even empirical evidence that its line-drawing is subject to dispute. "Under the Fourteenth Amendment, a State may rely on age as a proxy for other qualities, abilities, or characteristics that are relevant to the State's legitimate interests." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 84, 120 S. Ct. 631, 646 (2000). It is not uncommon that such challenges are brought against laws restricting employment opportunities for workers over a certain age. *Gregory v. Ashcroft*, 501 U.S. 452, 111 S. Ct. 2395 (1991); *Vance v. Bradley*, 440 U.S. 93, 99 S. Ct. 939 (1979); *Murgia*. "Our Constitution permits States to draw lines on the basis of age when they have a rational basis for doing so at a class-based level, *even if it 'is probably not true' that those reasons are valid in the majority of cases.*" *Kimel*, 528 U.S. at 86, 120 S. Ct. at 647 (emphasis added). Recognizing that "even improvident decisions will eventually be rectified by the democratic process," *Vance*, 440 U.S. at 97, 99 S. Ct. at 942, it is not the Court's province to overturn legislative enactments we believe to be unwise or outdated by evolving societal circumstances.

24

¶64 In *Satterlee*, we relied on the simple truth that "when an individual is considered retired, they have, by definition, ended their work life[,]" to uphold the constitutionality of terminating wage-loss benefits intended to bear a reasonable relationship to actual wages lost. *Satterlee*, ¶ 27. Despite the presence of illogical and unfair results as applied to some workers, we affirmed the rationality of using eligibility for social security benefits—based primarily on age—as a line of demarcation, in order to target limited workers' compensation resources toward those who are still considered of working age. We stated,

> With the statutory intent of § 39-71-710, MCA, in mind, it is rational for the workers' compensation system to terminate [permanent total disability] benefits at a time when, statistically, most people's work-lives have ended. While this may not always seem fair, it is not unconstitutional. By acting to terminate benefits as it does, § 39-71-710, MCA, rationally advances the governmental purpose of providing wage-loss benefits that bear a reasonable relationship to actual wages lost.

*Satterlee*, ¶ 28.

¶65 Our decision today cannot be reconciled with this clear pronouncement of the constitutionality of targeting wage-loss benefits toward those workers who, statistically speaking, are not yet at the end of their work life. The majority states that rehabilitation benefits "do not replace lost wages[.]" Opinion, ¶ 38. Clearly, though, vocational rehabilitation benefits are part of the wage-loss benefit provided by the workers' compensation statutes. By offering a means to facilitate an injured worker's return to the workforce, vocational rehabilitation benefits serve the objective of reducing overall wage loss. The law specifically defines a vocational rehabilitation plan as a plan that "reasonably reduces the worker's actual wage loss." Section 39-71-1011(4), MCA.

25

¶66 In drawing a parallel between the temporary *availability* of vocational rehabilitation benefits and the permanent partial disability benefits at issue in *Reesor*, the majority misses the mark. As we recognized in *Satterlee*, the rational basis determination turns on the *purpose* of the benefits. *Satterlee*, ¶ 23. Whatever the duration of the actual payments to the worker, there can be no dispute that rehabilitation benefits, like the benefits upheld in *Satterlee*, are intended to provide assistance throughout a worker's full work life—in this case, by training the worker for sustained employment in a new field when injuries have foreclosed continued employment in a previous field. Like education, the real benefits from rehabilitation training begin upon graduation, when the newly-trained student or worker can put his or her new skills to use. In contrast, the permanent partial disability benefits considered in *Reesor* are designed "to restore the claimant to a pre-accident wage level for a limited amount of time." *Satterlee*, ¶ 23 (citing *Rausch v. State Compen. Ins. Fund*, 2005 MT 140, ¶ 23, 327 Mont. 272, 114 P.3d 192).

¶67 Further, although the majority dismisses the purported governmental interests in the limitation on rehabilitation benefits as nothing more than "cost-containment," Opinion, ¶ 48, the cut-off represents a policy choice, entrusted to the legislature, to allocate resources toward those who, statistically speaking, will use them. This is no more a mere cost-containment measure than our tax code is a mere revenue-generating measure—each unmistakably reflects a wide variety of policy choices.

¶68 "Wage-loss legislation is designed to restore to the worker . . . wages lost due to the three major causes of wage-loss: physical disability, economic unemployment, and old age."

26

9 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 157.01 (rev. ed., Matthew Bender 2000). As such, the constitutionality of state laws like § 39-71-710, MCA, that offset workers' compensation by federal social security benefits "has, for the most part, been upheld, as against both equal protection and impairment-of-contract attacks." *Id.* at § 157.03[5][b] (citing cases). *See generally McDowell v. Jackson Energy RECC*, 84 S.W.3d 71 (Ky. 2002). As we referenced in *Satterlee,* there is a logical "interplay" between the state and federal statutory schemes under which wage-loss benefits "terminate when actual wages would normally terminate—upon retirement." *Satterlee*, ¶¶ 13, 27.

¶69 While the majority derives support from Mr. Caldwell's impressive work history, stating his situation "demonstrates the irrationality of categorically eliminating rehabilitation benefits once a person becomes eligible for social security[,]" Opinion, ¶ 51, Mr. Caldwell's personal situation is not determinative of the *facial* challenge he has brought against the statute. "*The difference* [between a facial challenge and an as-applied challenge] *is important.* If a court holds a statute unconstitutional on its face, the state may not [apply] it under any circumstances, unless an appropriate court narrows its application; in contrast, when a court holds a statute unconstitutional as applied to particular facts, the state may [apply] the statute in different circumstances." *In re Marriage of K.E.V.*, 267 Mont. 323, 336, 883 P.2d 1246, 1255 (1994) (Trieweiler, J., concurring and dissenting) (emphasis in original). Thus, even if Caldwell still could be a productive member of the workforce, the statute must be upheld against his facial challenge notwithstanding his individual circumstances. "Facial challenges, unlike as applied challenges, do not depend on the facts

27

of a particular case." *Brady v. PPL Mont., Inc.*, 2008 MT 177, ¶ 13, 343 Mont. 405, 185 P.3d 330 (2008) (Gray, C.J., dissenting) (citing cases).

¶70 By requiring an individualized examination of a worker's ability or willingness to return to work, Opinion, ¶ 50, the Court balances the interest of the government against that of the individual right infringed, effectively applying *a middle-tier* level of scrutiny to the statute's classification. *Lewis*, 219 Mont. at 434, 712 P.2d at 1314. Yet individualized testing is not constitutionally required, even if it would result in a more precise determination of eligibility. *Murgia*, 427 U.S. at 316, 96 S. Ct. at 2568.

¶71 The Court does not dispute that age may be a consideration in determining a worker's eligibility for rehabilitation benefits. Opinion, ¶ 51 (citing § 39-71-1006(1)(c), MCA) and ¶ 54 (Cotter, J., concurring) (same). That acknowledgement answers the rational basis inquiry and requires the statute to be upheld. There is legitimacy in targeting rehabilitation benefits toward those who are, by constitutionally-permissible definition, not retired. That the legislature found additional means to tailor vocational rehabilitation plans to account for age and other factors does not mean its decision to set an age-based limit on such benefits is irrational. Given the unquestioned legitimacy of the State's interest in providing benefits that bear a reasonable relationship to wage loss, the legislature reasonably may determine that retraining is most important for those workers with a long work life ahead of them and may channel resources toward that group of workers.

¶72 The majority and concurring opinions make a forceful public policy argument for extending benefits to those who continue working after reaching social security eligibility,

28

but that is the domain of a different branch of government. "Whether or not individual judges may agree with [the legislature's] assessment, it is not for the courts to reject it." *Vance*, 440 U.S. at 106, 99 S. Ct. at 947. While the statute in question may not survive a more heightened level of scrutiny, our review here is confined to rational basis. Under that test, the statute should be upheld.

¶73    I respectfully dissent.


                                        /S/ BETH BAKER



Justice Jim Rice joins in the foregoing dissenting opinion of Justice Beth Baker.


                                        /S/ JIM RICE